**RCA CORPORATION, Plaintiff,**

v.

**DATA GENERAL CORPORATION, Defendant.**

**Civ. A. No. 84–270–JJF.**

United States District Court,
D. Delaware.

July 15, 1988.

458

William J. Gilbreth, Norman H. Beamer and Robert Morgan of Fish & Neave, New York City, William J. Wade of Richards, Layton & Finger, Wilmington, Del., for plaintiff.

Douglas E. Whitney, Jack B. Blumenfeld, and Mary B. Graham of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

FARNAN, District Judge.

In this action, RCA Corporation ("RCA") charged Data General Corporation ("Data General") with willful and deliberate infringement of U.S. Patent No. 3,345,458 ("the Cole patent"). RCA also accused Data General of having willfully breached a licensing agreement entered into under the Cole patent.[1] Data General denied infringement and asserted a panoply of legal and equitable defenses related primarily to the issues of validity, noninfringement and unenforceability. The Court has jurisdiction over the patent issues pursuant to 28 U.S.C. § 1338(a), and has pendent jurisdiction over the alleged breach of the licensing agreement.

The Court conducted a bench trial in this action and, following submission of Proposed Findings of Fact and Conclusions of Law by the parties, presided over post-trial argument. In accordance with Federal Rule of Civil Procedure 52(a), this Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the issues of validity, infringement, unenforceability and damages.

## I. BACKGROUND FACTS

In order to understand the nature and character of this lawsuit, it is necessary to recount the prior litigation in this district involving the Cole patent. *See In re Cole Patent Litigation* (hereinafter *"HLA"*), 558 F.Supp. 937, 959 (D.Del.1983) (Cole patent held invalid as anticipated by British Dirks patent; however, but for Cole's invalidity, it would be infringed by the accused terminals), *rev'd in part, aff'd in part and remanded, RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1448 (Fed.Cir.1984) (judgment of in-

---

1. For patent infringement, RCA seeks damages for the period commencing from the filing of the Complaint to the expiration of the Cole patent. For breach of the licensing agreement, RCA seeks an accounting and award of damages attributable to the alleged breach. RCA also seeks an award of increased damages and attorneys' fees.

validity reversed, judgment that patent not proved invalid for obviousness affirmed). In the *HLA* action, RCA charged Hazeltine, Lear Siegler and ADDS [2] with willful and deliberate infringement of the Cole patent. The *HLA* decision has to some extent become intertwined with the instant litigation, although not inextricably so. The earlier case bears most directly on Data General's assertion that, if not invalid, the Cole patent is unenforceable because RCA's victory in the *HLA* litigation was achieved through the perpetration of a fraud on the *HLA* court. *See RCA Corporation v. Data General Corporation*, No. 84–270–JJF, slip op. at 2–4 (D.Del. October 27, 1986) [available on WESTLAW, 1986 WL 15684]. Additionally, the *HLA* litigation is pivotal to RCA's argument that the Federal Circuit's decision in *HLA* is stare decisis on the issues of Cole patent validity, infringement, and alleged inequitable conduct before the Patent and Trademark Office ("PTO").

### A. *The Cole Invention.*

In late 1959, RCA engineers Cole, Corson, and Stocker first conceived of the Cole invention. At that time, Cole was working on a display in connection with an RCA proposal to sell a display for a NORAD military command post installation in Wyoming. Cole, a systems engineer experienced in digital electronics and familiar with character generation techniques, contacted Corson, a member of RCA's Advanced Development Display Group, and Stocker, the leader of that same group, in connection with designing a display for the NORAD project. The group sought a fast, accurate, reliable, low maintenance system capable of displaying computer messages on a television-type display. Corson testified that the only digital way then known to the inventors to convert the data output of a computer for displays was a Wang Generator used in the Gordon patent.[3]

As to the actual invention of the Cole patent, neither Stocker nor Corson recalls the precise details of its conception. Stocker, however, did recall one turning point in the inventive process: "[Cole] came up with the amazing fact ... that alphanumeric [video] signals don't have to have halftones like the video gradation of brightness in a photograph. Its quite true, and I had known it, but I had never realized this. This opens a whole new field of binary systems in handling alpha-numeric symbology." This realization signalled the inventor's move toward digital technology. According to Stocker, this was the "concept of digital video [which] had come to [them]" that the video beam can be "turn[ed] ... on or off at definite times." In short, the inventors realized that characters could be formed on the screen by sending appropriately timed signals to the electron beam of the tube, turning it on and off at the correct instant. This insight was combined with the inventors' recognition that the timing and synchronization of the display of a television raster could be analyzed in terms of three variables: the code of the character to be displayed ("character code"); the scan line then being traced across the face of the tube ("scan line count"); and the horizontal position of the electron beam scanning across the face of the television tube ("position count").

While still at the conception stage, the inventors were dispersed. Corson was transferred to the west coast in late 1959, Cole was transferred to a facility in the Boston area shortly thereafter, and Stocker, the senior inventor, remained in Moorestown, New Jersey. With the consent of his fellow inventors, Stocker disclosed the Cole invention to RCA's patent department in March, 1960.

The basic Cole invention, which displays letters and numbers in fixed positions, was disclosed in terms of the embodiment illustrated in Figure 1 (see Appendix A) of the Cole patent disclosure. Figure 2 (see Ap-

---

**2.** Hazeltine refers to the Hazeltine Corp., Lear Siegler refers to Lear Siegler, Inc., and ADDS is an acronym for Applied Digital Data Systems, Inc. *In re Cole Patent Litigation, supra,* 558 F.Supp. at 938.

**3.** U.S.Patent No. 2,920,312.

pendix B) illustrates a more complicated embodiment of the Cole invention. It illustrates a system in which characters may be positioned randomly on the screen—so long as they are not overlapping. This embodiment was later dropped from the Cole patent. Stocker later admitted that the core matrix shown in Figure 1, which he described in the patent disclosure as the "heart" of the video generator, "illustrat[ed] the use of [the] Wang Generator for the digital generation of a video signal, but in the format of a line scan raster as used in television."

Thereafter, the Cole patent disclosure was the catalyst for feasibility studies conducted by an RCA display group located in Van Nuys, California. The object of the feasibility study conducted in Van Nuys was to "determine if there [was] a feasible system for utilizing digital methods to generate video for a display." In a section captioned "Summary," the authors noted that two methods for generating color video by digital techniques had been developed. In the technique called "computer generation of video (CGV) system, video is generated, one television line at a time, as a series of 'ones' and 'zeros' by a digital computer and accumulated in a buffer storage until the display is completed. Then the buffer storage repeats the video lines in a flicker-free raster scan." In the second system, entitled real time generation of video (RTGV) system, the display information is stored in a data store. The information is read from the data store at such a rate that it may be converted by a high speed character generator to video and presented to the display console as a flicker free display. With the RTGV system, the engineers sought to devise a system that would operate with the normal deflection mechanism of the display and generate randomly placed characters. The RTGV system differed from the system described in the Cole patent disclosure in that the latter was designed to display characters in fixed positions as on this page of text.

### B. *The Cole Patent.*

Claims 1 through 3 of the Cole patent, the claims in suit, are as follows:

1. A display system for generating character patterns for display on a display device that exhibits a television raster scan-line pattern, each character pattern being displayed in one character space,

means responsive to a certain character code for applying to a certain selected lead an output signal having a duration substantially equal to the scanning time in said scan-line direction through one character space,

means for generating scan-line select counts in synchronism with the scan lines of said raster, each scan-line count having a duration substantially equal to that of a raster scan-line,

means for generating position counts which occur successively during a scan along a scan-line through a character space, and

means for causing said output signal appearing on said selected lead, said scan-line counts and said position counts to supply to said display device a selected character pattern.

2. In a system for displaying a message comprising certain character patterns on a display device that exhibits a television raster scan-line pattern, wherein each different character pattern is manifested by a digitally coded data signal corresponding thereto, the improvement comprising generating means responsive to the data signal forming said message applied thereto for digitally generating a video signal for use in displaying said message on said display device, and means for applying said data signals forming said message to said generating means.

3. The improvement defined in claim 1, wherein said generating means include first means for producing as said video signal a signal which selectively has either a first level or a second level for the entire duration of each respective one of successive elemental time intervals all of which have the same predetermined duration, the duration of each television raster scan line being an integral multiple of said predetermined duration, and second means coupled to said first means for selecting which of

said first and second levels, respectively, exists during each respective one of said successive elemental time intervals in accordance with the data signals forming said message.

The Cole patent describes a system for decoding digital computer symbol codes representing a message and converting them, using digital techniques, into digital video signals for displaying the message on a television-type cathode ray tube ("CRT"). These video signals are then used to blank and unblank an electron beam to display the message as the beam scans across the screen. The beam scans the screen in a television raster scan pattern. The term "television raster scan" describes a standard deflection pattern of the electron beam in the CRT of a standard television monitor and other television-type CRT's.

As the electron beam is deflected, it sweeps across the screen of the CRT. If the video input to the television monitor turns on the electron beam, the beam will illuminate the phosphor coating inside the face of the CRT screen as it scans the area in which the image is to be displayed. This will cause that part of the coating to glow for a short time. If the beam is turned off, it does not strike the coating, and that area of the screen remains dark. Thus the video input can paint a picture on the face of the CRT if it is properly coordinated with the raster scan deflection signals.

In the Cole system, the beam scans across one horizontal line at a time. The horizontal deflection circuits of the CRT cause the beam to sweep rapidly from left to right, horizontally, across the full CRT screen. The beam then "flies" back to the left side of the screen, moving sequentially down the screen to the bottom. Each successive horizontal sweep thus falls below the preceding one. At the end of the vertical sweep, the beam flies back to the top of the screen and repeats the process.

The digital video control signal controls the points at which the beam illuminates the screen during its scan. The beam can therefore be used to form a message or image on the screen. The speed of the beam's movement as it traverses the screen renders it undetectable to the eye. Image flicker is avoided because the beam "refreshes" each bright spot at a high rate.

The characters which comprise the message are formed on the screen by patterns of dots created when the beam is on. The Cole specifications indicate that each character can be represented by the dots in a rectangular dot matrix having fixed dimensions (e.g., five dots wide by seven scan lines high). A character is displayed on the television screen within a character space that includes the dot matrix of the character and additional blank space to separate the characters on the screen. As illustrated in Figure 4 (see Appendix C) of the Cole patent, each horizontal slice of a character dot matrix corresponds to the dots for that character along one television raster scan line. Thus, to form the character shown in Figure 4, dots 103–105 (for the character "A") and dots 106–109 (for the character "B") will be written as the electron beam moves along scan line 9 in Figure 4. Thus, each character is formed slice by slice, in a fixed character space on the screen consisting of a matrix of dots.

As the beam tracing the television raster moves across the screen in a scan line, the binary codes for each of the characters to be written in a row across the screen are sequentially provided to a "digital-to-video generator." Timing and control circuitry (vertical and horizontal drive pulses) produce two separate count signals which, respectively, provide the digital-to-video generator with information from a television sync generator, representing the scan line position of the electron beam and the dot position of the beam along the scan line. This circuitry also provides control signals to read the proper character codes out of the character code memory at the appropriate time for display. The character code information, the scan line count signal, and the dot position count signal are each independently applied to the digital-to-video generator. Thus, three pieces of information are applied to the digital-to-video generator: (1) the code that specifies which character shape is to appear in the current space; (2) the horizontal location of the

beam within the character space; and (3) the vertical location of the beam within the character space. Using strictly digital technology, the digital-to-video generator then produces a signal that has a logical value of either one or zero, depending on whether the dot at the corresponding point in the character is to be illuminated or not. This output is applied to the television monitor circuitry as a video signal. The video dots are then displayed in raster scan order as the electron beam moves along the CRT screen. This direct translation of character codes into television display signals without intermediate storage is commonly referred to as "real time" or "on the fly" operation.

The invention described in the Cole specifications purports to provide several important advances over prior art devices. RCA attributes the advantages of the Cole invention to a "unique combination of features." One such feature is Cole's ability to circumvent the "scan conversion" problems associated with the use of a standard television raster scan CRT without resort to intermediate storage of the video signal output of the character generator. As Judge Stapleton noted in his examination of the Cole patent, most prior art display systems "[wrote] each character in its entirety on a CRT screen before going on to the next character to be displayed." *In re Cole Patent Litigation, supra,* 558 F.Supp. at 942. Most of these systems used miniature ("mini") raster scan, dot matrix symbol pattern character generators. In systems using the mini-raster scan pattern, the beam scanned vertically from top to bottom left to right, over the position on the CRT where the character was to appear. As in *Cole,* the character itself was written a slice at a time. However, in a device employing a mini-raster scan, the beam scanned through only one character at a time, completing that character before proceeding on to the next.

Judge Stapleton identified two disadvantages associated with display systems employing the mini-raster scan pattern: (1) the requirement of special circuits to cause the electron beam to deflect in a mini-raster scan pattern; and (2) the necessity for intermediate storage. To use such a sys-

tem on a standard television monitor, a message written in character-by-character order had to be stored in a memory and read out a scan line at a time in order to avoid the "scan conversion" problem mentioned above and in order to be compatible with the television raster scan pattern. *In re Cole Patent Litigation, supra,* 558 F.Supp. at 942. The invention disclosed in *Cole* eliminated the need for special deflection circuitry and for "intermediate storage between the character generator and the CRT." Unlike systems using the mini-raster scan pattern, the character generator described in the Cole system involved no intermediate storage and produced the video signal in a manner compatible with the television raster scan pattern. Thus, the Cole system was the first entirely digital system capable of "real time" or "on the fly" electronic generation of a display of a message composed of alphanumeric characters on an ordinary TV screen.

As it did in *HLA,* RCA presses here that the purely digital system described in *Cole* represented a significant improvement over prior art display devices utilizing analogue character generators.

### C. *Overview of Display Technology.*

In his discussion in *HLA* concerning the Cole patent specifications and the relevant prior art devices, Judge Stapleton noted four technological limitations relevant to a system for receiving digital coded data for display in decoded form on a CRT. *RCA Corp. v. Applied Digital Data Systems, supra,* 730 F.2d at 1442 (citing *In re Cole Patent Litigation, supra,* 558 F.Supp. at 943). For the purpose of assessing the relevant prior art and the advances, if any, made by Cole, I set out the technological limitations considered by Judge Stapleton in *HLA:*

1. The type of scan pattern. As noted above, the two types of primary concern here include one in which the scan covers one character space at a time (a miniature raster scan pattern), and one in which each line of the scan covers a horizontal slice of each character in a row, as the beam scans across the entire

width of a CRT screen (television raster scan pattern).

2. The type of CRT. The two principal types are the memory tube, which can hold a picture for minutes, and the non-memory type (including some with high-persistance phosphors), of which a TV tube is an example, that needs to be "refreshed" at a sufficient rate to make the picture appear continuous.

3. The type of character generator. The two broad categories are analog and digital, as related to the type of signal in and signal out, whether continuously variable (analog) or variable only in discrete increments (digital).

4. Storage. A storage or memory is required in a system employing a non-memory CRT because the video signal must be applied to the CRT a number of times a second. The memory may, however, be either one that stores the character code prior to decoding or one that stores the video bits produced by the translation process. When the former is used, the system is sometimes characterized as an on the fly system to indicate that the video bits are applied to the input of the CRT as each one is generated by the translator in contrast to a system that has storage of the video bits.

*In re Cole Patent Litigation, supra,* 558 F.Supp. at 943.

## II. EFFECT OF THE HLA DECISION

■ Before examining the issues of validity, infringement, and unenforceability, the Court must first confront the question of whether the doctrine of stare decisis binds the Court to the decisions reached by the United States Court of Appeals for the Federal Circuit and by this District Court in prior Cole patent litigation. Throughout this litigation and in its posttrial brief, RCA has argued that it is entitled to the stare decisis effect of the *HLA* decision. According to RCA, the doctrine of stare decisis requires the Court to hold RCA's Cole patent valid, infringed, and not unenforceable because of alleged inequitable conduct before the PTO. While I am prepared to observe the limitations imposed on the Court by stare decisis, I disagree that re-spect for and adherence to the doctrine compels the result urged by RCA.

The Federal Circuit in *Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705 (Fed. Cir.1983) addressed the application of the doctrine of stare decisis to patent cases. The Court stated:

> Furthermore, we note that the doctrine of stare decisis is generally an inappropriate one in patent litigation. As stated earlier, patents cannot be held "valid" under all circumstances. Rather, a court merely decides in a particular case that the one attacking validity has not overcome the statutory presumption of validity.... To be sure, a prior holding of "validity" should be given weight in a subsequent suit on the issue of "validity." But the prior holding does not necessarily have stare decisis effect.

*Id.* at 711. The Court added that the weight to be accorded a prior holding of "validity" depends on the additional evidence of prior art or patentability introduced in a second lawsuit. *Id.*

I find that the record in the instant case differs in significant respects from the *HLA* record and, therefore, conclude that RCA may not rely on the *HLA* decision for stare decisis effect. This conclusion is based on the fact that some of RCA's witnesses in the *HLA* action did not testify in the instant action, and at least one RCA witness gave testimony at the first trial that was inconsistent with his testimony at the second trial. Additionally, Data General has introduced documentary evidence not in the *HLA* record, as well as the expert testimony of engineers of ordinary skill in the art. Because of these substantial differences in the records of the two cases, I conclude that RCA is not entitled to the stare decisis effect of the *HLA* decision.

## III. VALIDITY OF THE COLE PATENT

Data General has challenged the validity of the Cole patent on three grounds. First, Data General contends that the Cole patent was placed on-sale more than one year

464

prior to the date of the patent application and is, therefore, invalid under 35 U.S.C. § 102(b). Data General also contends that the Cole patent was anticipated by the prior art and by a printed publication stored at the Stanford Research Institute. Finally, Data General asserts that the Cole patent is invalid under 35 U.S.C. § 103 because it was obvious in light of the pertinent prior art. The Court will now examine each of these challenges to Cole's validity.

A. *On–Sale Bar.*

■ Data General contends that RCA's submission of a proposal to the Federal Aviation Administration ("FAA proposal") on October 8, 1962, placed the Cole invention "on sale" more than one year prior to the October 16, 1963, filing date of the Cole patent application. In asserting this on-sale bar claim, Data General "has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Electronics Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988). If Data General can make this prima facie showing, then RCA must "come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the grace period." *Id.*

In August, 1962, the FAA sent ten prominent companies a Request for Proposal ("RFP") and an Engineering Requirement ("ER") for character generation equipment. The statement called for the contractor to provide "all necessary qualified personnel, facilities, materials, equipment and services and ... design, develop, fabricate, test and furnish an alpha-numeric and symbol generation equipment for use with rectilinear raster scan type of radar brights displays." RCA was among the six companies that responded with proposals. On October 8, 1962, RCA submitted a proposal for a system called real time generation of video

("RTGV"). The proposal was composed of two distinct parts: (1) a 68–page technical description with background information and a "detailed delivery schedule and a description of rate of completion;" and (2) financial data and cost analyses. This second part of the proposal was never produced by RCA during discovery in the instant case. The RTGV system was designed primarily by RCA engineer Walter Helbig of RCA's Data Systems Division in Van Nuys, California.

The Court finds that RCA's submission of the proposal to the FAA was a definite offer to sell the RTGV system. The FAA was not seeking to fund research programs; instead, it was looking for a "prototype system" to be followed by "production quantities." Chuck Fanwick, RCA's liaison with the FAA, testified that RCA viewed the FAA proposal as a purely commercial endeavor. According to Fanwick's testimony, RCA viewed the FAA as a "prospective customer" who could provide "a major piece of business" resulting in revenue to RCA. The Court concludes that RCA's proposal to the FAA was an offer to sell solely for the purpose of commercial gain.

The Court must next determine if the subject matter of the FAA proposal fully anticipated the Cole invention or rendered the invention obvious. In order to address this question, it is necessary to first recount RCA's development and refinement of the Cole invention in 1962.

Although RCA conducted feasibility studies on Cole or variations of Cole in Van Nuys, California, RCA authorized no funds to build the invention until Arthur Stocker, one of the inventors, disclosed it to RCA's Canadian subsidiary in 1962. In March of 1962, Stocker met with representatives of RCA's Canadian subsidiary ("RCA Canada") and Trans Canada Airlines ("TCA", now Air Canada). At this meeting, TCA informed Stocker of its desire to replace its manual menu board/television camera display system with a more automated system for displaying flight information. Following this meeting, Robert Clark, an engineer at RCA Canada, began working on replacements for TCA's menu board system. The

system that was ultimately built was labelled DIVCON, an acronym for digital-to-video-conversion. The facts surrounding the building of the DIVCON system are the subject of a great deal of controversy.

In preparation for the *HLA* trial and during the trial, before certain documents emerged in this case which placed the validity of the Cole patent in jeopardy, RCA called Clark to testify regarding the DIVCON system. The relevance of that line of inquiry was counsel's assertion that the "opposing parties are making [certain arguments] concerning the commercial feasibility or lack of it of the Stocker–Cole–Corson invention." At the *HLA* trial, after having reviewed documents to refresh his recollection of the events of 1962, Clark testified that the following events took place. In April, 1962, Clark conferred with Stocker and began to "try to implement [Cole] as detailed as possible in the next couple of weeks to see if in fact it looked like a practical and economical approach to the problem." In April, 1962, Clark prepared a circuit diagram of the DVG–2 system (i.e., Cole Figure 2). Up until the middle of May, 1962, Clark, worked on a proposal to Air Canada which utilized the DGV–2 system. By mid-May, Clark had formulated a block diagram that constituted a "digital implementation of [Stocker's] concept." In June, Clark personally presented the proposal to Air Canada. According to Clark's *HLA* testimony, TCA was "very pleased" but wanted to see something working to demonstrate that Clark could "indeed, provide a digital video display using semi-conductor logic and have that synchronized to a standard TV source...." Clark testified that by the end of June, 1962, he had no doubt that he could demonstrate the feasibility of the Cole concept. In Clark's own words, "I had no question that I could go ahead and build that system." Toward the end of June, Clark began to build a system using scrap components. Using "whatever [they] could get [their] hands on," he and his coworkers "had a completed breadboard by the end of August." In September, 1962, the flight information display utilizing DVG–2 was demonstrated to Air Canada.

Clark testified in the instant case that the system he demonstrated to Air Canada in 1962 met all of the elements of claim 1. This recitation of the events culminating in Cole's reduction to practice is consistent with Clark's deposition testimony given approximately one year before the trial in *HLA*. The version of events Clark gave in *HLA* was reaffirmed after the *HLA* trial at his first deposition in this case in early 1985.

Following RCA's production of the FAA proposal, Clark revised his testimony on the timetable concerning the reduction to practice of DVG–2. RCA produced the FAA proposal in the fall of 1985, after the conclusion of the *HLA* case and during discovery in this case. The existence of an FAA proposal was an operative fact in the *HLA* litigation—indeed, RCA relied on the testimony of Clark and Helbig, the RCA engineer intimately connected with the FAA proposal, to establish commercial success and feasibility. However, the actual document was not produced in the *HLA* case and did not surface in this case until late in 1985. Only after production of the document itself, which revealed that the proposal had been submitted more than one year prior to the filing of the Cole patent application, did Clark's *HLA* testimony on the DVG–2's operability and reduction to practice as of fall 1962 emerge as a potential liability.

In this case, Clark's testimony regarding the development and timetable of a working Cole system stands in stark contrast to his prior testimony. Here, Clark testified that, after the proposal to Air Canada in June, 1962, he began to work on the timer and control unit. Clark stressed that the timer and control unit was "a particularly difficult piece of logic to develop ... [since] we had to synchronize those counters to a sync generator." Clark further testified that it took him until mid-November of 1962 to wire the symbols needed to produce a partial flight display. Clark stated that he was unable to wire the symbols needed to generate the message "the quick brown fox jumped over the lazy dog" until January of 1963. In a bewildering departure

from his earlier testimony, Clark testified that he never used the DVG–2 in a full system.

In the ebb and flow of trial, the Court is often called upon to assess a witness' credibility. These determinations are often difficult, but this one is not. Throughout the *HLA* trial and well into the discovery phase in this case, Clark stood by one critical fact—that he and his fellow workers at RCA Canada "had a completed breadboard [of the DVG–2] by the end of August 1962," that the device operated "very satisfactorily" and that the device he demonstrated to Air Canada in September 1962 generated a screen of complete flight information. His stunning about face in this trial is simply implausible, especially in light of the recent emergence of the potentially damaging FAA proposal.

RCA attempted at opening argument and attempts in its post-trial brief to explain Clark's testimonial flip-flop. According to RCA, after reviewing documents with RCA lawyers, Clark realized that his *HLA* testimony had "telescoped" the sequence of events in RCA Canada that occurred in late 1962 and 1963. The evidence that emerged on cross-examination, however, casts this explanation in a somewhat different light. In the fall of 1985, a few months after the production of the FAA proposal, Clark met with RCA counsel. Clark was shown selected documents "and [was] pressed on the subject" of reduction to practice. After that meeting, Clark's former testimony was completely disavowed. The new version, as recounted by Clark, appears not to be a recollection, but rather a reconstruction from the selected documents he was shown. In fact, Clark testified at trial that his actual recollection of events comports with that given in the *HLA* case and prior to the discovery of the FAA proposal. It lends no credence to Clark's revised testimony that many of those selected documents were reviewed before he testified in the *HLA* case. Further, none of these selected documents reveals what was actually demonstrated in September of 1962.

Further, other documents undercut Clark's revised testimony. An October 19, 1962 memorandum from inventor Stocker to one O.V. Mitchell concerning the digital generation of video signals states that RCA Victor Ltd. of Montreal had developed a circuit based on these ideas with the thought of selling it to commercial airlines. Additionally, an affidavit from Clark, dated March, 1966, when his memory was undoubtedly more refreshed, refers to a 1962 proposal made to the Department of Transport in Ottawa, which proposal contained a photograph of the complete flight display. Finally, Clark's testimony in this trial contradicts his *HLA* testimony that RCA attorney Norton incorporated the DVG–2 in figure 2 of the Cole application in August 1963 in order to have "a design that was working." As Data General correctly points out, if the DVG–2 system was never working, as Clark now asserts, Norton by his own account would not have incorporated it. In the face of this evidence there is but one reasonable, plausible inference for the Court to draw: Clark built the DVG–2 system by September, 1962. That is, for the purposes of assessing a possible on sale bar, Clark had built a functional device coming within the scope of the claims by September, 1962.

Since the RCA patent had reduced the Cole invention to practice in September, 1962, the Court must examine the subject matter offered for sale in the FAA Proposal.

At trial, Michael L. Dertouzos, Professor and Director of the M.I.T. Laboratory for Computer Science, an expert offered by Data General, testified that the system used in RCA's proposal to the FAA "uses a scheme ... [which] drives a Rom which in turn dumps its contents into a shift register, which in turn through some additional circuitry goes to the CRT." Dertouzos further testified that if the Cole patent covers a Rom/shift register approach, such as that found in Data General's accused terminals, then it also covers the FAA proposal. Helbig, the designer of RTGV, and Corson, one of the Cole inventors, agreed that the FAA proposal used a Rom and a shift register as the output of the video dot generator.

In an effort to distinguish Cole from the RTGV system proposed to the FAA, RCA contended at trial that the system proposed to the FAA would include analogue delay lines at the output of the Rom, while Cole is an all digital system. The Court finds, however, that this is an after the fact distinction. The FAA proposal refers repeatedly to its "digital approach" and "the digital character generation equipment." In at least two places in the proposal when describing the RTGV alpha-numeric and symbol generator, RCA stated that "it can be seen from the functional description of the RTGV equipment ... that this equipment is almost entirely digital in nature. Exceptions to this digital nature are entirely in the video amplifiers required as output from the video dot generator matrix."

RCA also asserts that the RTGV system was a "very complex system which was a total departure from the system ultimately claimed in the Cole patent. The proposal is more complex than anything disclosed in the Cole application." According to RCA, the complexity of the RTGV system derives from the fact that it attempts to address the more challenging problem of placing characters at arbitrary locations on the display screen and thus does not have Cole's fixed character spaces in checkerboard pattern. However, the FAA required a system that could display a page of text, and Helbig admitted that the RTGV system "could be used to display text" in typewriter fashion.

The Court finds RCA's assertion that the RTGV system of the FAA proposal did not use the Cole patent to simply be unpersuasive. In the *HLA* trial, Helbig testified that RCA intended if awarded a purchase contract from the Federal Aviation Agency to use the Cole invention in the equipment supplied to the Federal Aviation Agency. During the Cole patent litigation, Helbig also asserted that the RTGV system was based on the Cole invention disclosure.

When discussing a block diagram figure of the RTGV video bit generator, Helbig explained that the block "shows basically the system that was covered in the invention disclosure for Cole–Corson–Stocker, plus the additional components that we had to add to make up for the random positioning of the characters and for the color in the display." In essence, Helbig stated throughout the *HLA* litigation that the system of the Cole patent is a form of RTGV.

Throughout *HLA*, RCA maintained that the RTGV system was evidence of feasibility and reduction to practice of Cole. In the *HLA* pretrial order, RCA stipulated that Helbig "made a feasibility study of the digital generation of video, and Helbig prepared descriptions of two systems [CGV and RTGV], one of which [the RTGV] used the approach of the Cole patent disclosure."

The Court concludes Data General has established by clear and convincing evidence that the Cole patent is invalid under 35 U.S.C. § 102(b) because the invention was on-sale in this country more than one year before the date of the patent application. RCA offered for sale, in its October 8, 1962 FAA proposal, a device that used the Cole invention. This offer occurred more than one year before RCA filed its patent application for Cole.[4] RCA has failed to present any credible evidence supporting its claim that the FAA proposal did not place the Cole invention "on sale." Instead, RCA has shifted its summary of historical events and presented witness testimony which was strikingly inconsistent with previous testimony given under oath. On this record, the Court concludes that the Cole patent is invalid because of an on sale bar under section 102(b).[5]

**B. *Anticipation*.**

**1. The SRI Memorandum.**

 Data General contends that the Cole patent is invalid under 35 U.S.C.

**4.** The Cole patent application was filed on October 16, 1963.

**5.** If the Cole patent were not invalid under § 102(b), the Court finds that the Cole patent would have been obvious under 35 U.S.C. § 103 in light of the device disclosed in the FAA proposal. The trial testimony indicated that the FAA proposal disclosed a device which used all of the claims of the Cole patent. It would have been obvious to an individual of ordinary skill in the art that the Cole invention was embodied in the device described in the FAA proposal.

§ 102(b) because the invention was described in a memorandum stored in the Stanford Research Institute ("SRI") library more than one year prior to the date of the Cole patent application. The Cole patent is presumed valid and Data General must demonstrate by clear and convincing evidence that the SRI memorandum was a "printed publication" which disclosed each and every element of the Cole patent. *Mannesmann Demag Corp. v. Engineered Metal Products, Inc.*, 605 F.Supp. 1362, 1365–67 (D.Del.1985), *aff'd*, 793 F.2d 1279 (Fed.Cir.1986). A "printed publication" is a publication that is sufficiently accessible to members of the public who are interested in the art and exercise "reasonable diligence." *In re Hall*, 781 F.2d 897, 900 (Fed.Cir.1986).

The SRI memorandum was prepared in October, 1957 by Earle Jones, a graduate student at Stanford. The memorandum detailed approaches that could be used to develop a computer printer using an electrostatic printing tube ("EPT") as the printing mechanism. The A.B. Dick Company was considering the feasibility of an EPT system in its duplicating equipment and had requested the Stanford Research Institute to conduct research in that area. In his memorandum, Jones proposed eleven different systems that could hypothetically use an EPT tube. The purpose of the memorandum was to provide A.B. Dick with information and technical guidelines concerning the most feasible approach in terms of cost, reliability, performance, and quality.

The Jones memorandum was filed in a special vault in the SRI library with classified government documents. The library personnel maintained the memorandum as confidential and only members of the SRI library staff had access to it. In order to insure that the proprietary information was not compromised, the SRI personnel only prepared a limited number of copies of the memorandum and each copy was identified to control its distribution. The SRI memorandum was never loaned to another library and was not made available to the public. The SRI memorandum was listed on a project card in the library; however, the library personnel were required to advise members of the public that the memorandum was "not available" from the SRI library and to refer the inquiry to Alan Roshkind, A.B. Dick's Vice President of Research and Engineering.

There is a conflict in the testimony concerning the question whether the report would have been available if a member of the public requested it. Dolores Leitner, an employee of the SRI library since 1959, testified that at the request of A.B. Dick, the SRI memorandum was kept confidential and was never available to the public. According to Leitner, the SRI library was never given permission by A.B. Dick to give the memorandum to any member of the public and no person outside of the SRI library ever had access to the memorandum. Data General offered the testimony of Roshkind, A.B. Dick's head of the project, in an effort to rebut Leitner's testimony. Roshkind testified that if a request had been made for the memorandum, he would have allowed any interested party to review it. Further, Roshkind testified that he had not requested that SRI first contact him before disseminating the memorandum.

The Court concludes that Data General has failed to meet its burden of proving by clear and convincing evidence that the SRI memorandum was a printed publication sufficiently available to the public. The memorandum was kept in a part of the library where the general public did not have access to it. It is unclear from the disputed testimony whether a member of the public would have been permitted access to the memorandum even if he or she had specifically asked to see it. On this record, the Court rejects Data General's contention that the SRI memorandum was a printed publication that anticipated the Cole patent.

2. The Amdahl Patent.

Data General also asserts, in an extremely cursory fashion, that if the Cole patent covers display devices using Rom/shift reg-

isters, then the Amdahl[6] patent anticipates Cole.

The Amdahl patent was issued in 1966, on a 1960 patent application, and discloses a display system for a T.V. raster scan using an intermediate storage system. Data General has failed to explain with any specificity in what way the Amdahl patent discloses each and every element of the Cole patent. *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 738 (Fed.Cir.1984). The burden on a party asserting the defense of anticipation is a stringent one and Data General has not presented any plausible contentions to support its claim that the Amdahl patent anticipates Cole.

### C. *Obviousness.*

■■■ Data General also avers that the Cole patent is invalid on obviousness grounds under 35 U.S.C. § 103. In addressing Data General's claim, the Court must determine the scope and content of the prior art, the level of ordinary skill in the pertinent prior art, and differences between the pertinent prior art and the Cole patent. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The Court must also consider secondary considerations such as the commercial success of the Cole patent in deciding the obviousness issue. *Id.* at 17–18, 86 S.Ct. at 693–694. The Cole patent is presumed valid under 35 U.S.C. § 282, and Data General, as the party attacking the validity of the patent, at all times has the burden of persuasion. *SSIH Equipment S.A. v. U.S. International Trade Commission*, 718 F.2d 365, 375 (Fed.Cir.1983).

A logical starting point for the analysis of the obviousness issue is an examination of the level of ordinary skill in the art.

The parties have stipulated that a person of ordinary skill in the art was an individual familiar with display and display systems, and having a degree in electrical engineering and substantial research and development experience in designing display systems. The parties are also in substantial agreement as to the scope of the pertinent prior art. The pertinent prior art includes systems with character generation for computer displays.

The primary prior art relied on by Data General on the issue of obviousness is the Gordon[7], Evans[8], and Amdahl[9] patents. The Court must determine whether Cole invention would have been obvious to an individual of ordinary skill "in view of the teachings of the prior art as a whole." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed.Cir.1983).

The Gordon patent teaches a system in which character shape information is derived from a matrix of magnetic cores through which sense wires are threaded in the shapes of the characters. The matrix has row and column drivers for use in a mini-raster scan pattern and special deflection circuitry to control the deflection of the CRT beam. The system also uses other deflection circuitry to control the positioning of the characters on the screen. The CRT beam traces a mini-raster scan pattern in which one character at a time is written. The Gordon patent was filed on August 13, 1953, and issued on January 5, 1960.

RCA has argued that, of all the prior art, the Evans patent is the closest to the Cole patent. The Evans patent was filed May 8, 1959, and issued January 16, 1962. Evans uses a monoscope character generator which generates a video signal directly,

---

6. U.S.Patent No. 3,241,120.

7. U.S.Patent No. 2,920,312.

8. U.S.Patent No. 3,017,625. The Evans patent was considered by the Examiner during the prosecution of the Cole patent.

9. U.S.Patent No. 3,241,120. Data General also contends that the Jones SRI memorandum and the FAA proposal are relevant prior art. The Court has previously determined that the SRI memorandum was not a "printed publication"

accessible to the public and, therefore, the SRI memorandum cannot be considered part of the prior art. As for the FAA proposal, the Court previously has found that the proposal placed the Cole invention on-sale under section 102(b) and invalidated the Cole patent. Additionally, the Court found that the Cole invention would have been obvious in light of the FAA proposal, since the proposal describes a system that essentially uses the Cole invention.

on-the-fly from digital character codes to a television raster scan CRT without intermediate storage. The monoscope in the Evans patent "is an analog translator, commonly used in the 1950's which translates a character code into a pulse train with pulses of varying duration. The pulse train can be supplied to the CRT of a television, for example, to generate characters in sequential locations." *RCA Corp. v. Applied Digital Data Systems, supra*, 730 F.2d at 1447. The Evans system also contains a memory unit which stores digital character codes in the order in which the characters are to be displayed. *See In re Cole Patent Litigation, supra*, 558 F.Supp. at 951. Row counts and column counts produced by digital timing circuits position the scanning beam on the television screen.

Finally, the Amdahl patent discloses a character generator which receives character codes and then generates the pattern of each character, one character at a time. As the pattern of each character is generated, it is stored on a magnetic storage surface and then, in an entirely separate step, read out in television raster scan order. The Amdahl patent was filed on July 25, 1960, and issued on March 15, 1966.

The Court finds that the Cole patent would not have been obvious in light of the separate display systems disclosed in the Amdahl, Gordon, and Evans patents. There are substantial differences between the Cole invention and the separate systems disclosed by each patent. First, the Amdahl patent discloses an intermediate storage system in which the video signal is repetitively read from the magnetic storage surfaces. The character generator in Amdahl does not directly generate the video signal as is the case with the Cole patent. In addition, the Amdahl patent has no scan line counts or position count signals.

The Gordon patent, unlike Cole, is incompatible with a standard television receiver. Gordon does not trace characters in the television raster scan pattern used by Cole. Instead, Gordon uses a mini-raster scan system which traces one character at a time and requires special, expensive circuitry to control the deflection pattern of the CRT beam. Moreover, Gordon does not include a position counter or a scan line counter. While I agree that Evans is the most pertinent prior art system, the Evans system lacks key features of the Cole invention. The most significant difference between the two systems is that Evans translates digital character codes using an analog monoscope character generator, while Cole uses a digital character generator.

As an additional attack on the validity of the Cole patent, Data General contends that it would have been obvious to a technician with ordinary skill in the art that the "combination" of the Gordon and Evans patents would yield Cole. This same argument was advanced and rejected in the *HLA* action. Judge Stapleton found "no suggestion in any of these references, or anywhere else in the prior art, that [Gordon and Evans] could or should be so used." 558 F.Supp. at 953. Data General asserts that new expert testimony presented in the instant case clearly indicates that the combination of Gordon and Evans was feasible and obvious. I cannot find any suggestion in the record that Gordon and Evans could be combined to produce the display system of Cole.

The Gordon patent is described as a mini-raster scan system throughout the patent. The interrogation of the core matrix to generate a symbol pattern in mini-raster scan order is a basic aspect of the system. There is no suggestion in any of the claims of the Gordon patent of a system using a television raster scan display system. Although the Gordon patent does discuss the advantages of digital symbol pattern generators over monoscopes and other analog devices, the discussion is strictly in terms of a mini-raster display system. Similarly, the Evans patent is described strictly in the context of an analog monoscope.

Data General has not produced any evidence explaining how Gordon and Evans could be "combined" or what such a combination would look like. Instead, Data General relies on the conclusory statements of expert witnesses that Gordon "could be used with a T.V. raster" and that such a

combination was "certainly within the conceptual grasp and knowledge" of skilled engineers of that period. Such statements, made with the benefit of hindsight, contribute little to an obviousness analysis. *See In re Cole, supra,* 558 F.Supp. at 954 ("Engineers who conceive inventions in an art like this one write them down.").

The Court also concludes that the secondary considerations concerning the patenting of the Cole invention support a finding of non-obviousness. Prior to the Cole invention, numerous engineering groups in the country had tried for a number of years to design display systems for computer generated messages. Despite the technical expertise of these research groups, none could discover a system that was as reliable, versatile, and economical as the Cole system. At the time of this litigation, RCA had received approximately $24,000,000 in royalties under the Cole licensing program. According to RCA, it has received royalties from more than 4,000,000 video display terminals that use the Cole patent. While sheer numbers alone are insufficient to buttress a finding of non-obviousness, *see EWP Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 907–08 (Fed.Cir.1985), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985), the Court finds RCA's evidence of its licensing to be probative because prominent members of the video terminal industry, including Hazeltine Technical Development Center, executed license agreements to use Cole. Many of these license agreements were entered only after extensive studies of the relevant prior art and the question of infringement.

The Court concludes, after examining the pertinent prior art and secondary considerations of obviousness, that Data General has failed to demonstrate under section 103 that the Cole patent is invalid on obviousness grounds.

## IV. ENFORCEABILITY

Data General has also asserted that the Cole patent is unenforceable due to RCA's fraudulent suppression of documents during the *HLA* litigation and RCA's inequitable conduct before the PTO during the Cole patent application. The Court concludes neither assertion supports a finding of unenforceability.

### A. *Fraud on the HLA Court.*

■ Data General claims that the Cole patent is unenforceable because of RCA's suppression of discovery during the *HLA* trial. Specifically, defendant asserts that RCA failed to produce the FAA proposal and the RCA memo from Arthur Stocker, one of the inventors of the Cole device (hereinafter referred to as "Stocker memo"), in response to *HLA* discovery requests.

It is with some reluctance that the Court will even consider Data General's argument. The defendant is seeking to have the Cole patent declared unenforceable based on what occurred in a prior suit. The Court is aware that this District has examined previous patent litigation in order to assess the enforceability of a patent currently in suit. *See Rixon, Inc. v. Racal–Milgo, Inc.,* 551 F.Supp. 163 (D.Del. 1982). The Court fears, however, that allowing such examinations by a trial court will encourage defendants in patent cases to try to relitigate every prior case involving the patent in suit. Indeed, in *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1234 (Fed.Cir.1985), the Federal Circuit Court expressed "doubt as to whether non-parties to [a prior] litigation could take advantage of [that prior] litigation." This Court also has doubt whether a non-party should have standing to challenge a previous patent suit. While questioning the defendant's standing to advance this argument, absent a more definitive statement from the Federal Circuit, the Court will address defendant's claims.

The defendant has the burden of proving fraud on the *HLA* court by clear and convincing evidence. *Brown v. Pennsylvania Railroad Co.,* 282 F.2d 522, 527 (3d Cir. 1960), *cert. denied,* 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696 (1961); *Rixon,* 551 F.Supp. at 171. To establish "fraud on the court", a party must present evidence of "fraud which does or attempts to defile the

court itself ... so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Martina Theatre Corp. v. Schine Chain Theaters, Inc.*, 278 F.2d 798 (2d Cir.1960) (*citing* 7 Moore, Federal Practice ¶ 60.33, at 512).

The Court will now examine the substance of the defendant's allegations of fraud on the *HLA* court. These allegations are not new to this Court. The defendant, in a pretrial proceeding, moved to compel discovery of documents RCA claimed were protected under the attorney-client privilege. In support of its motion, the defendant claimed that the attorney-client privilege was inapplicable because RCA counsel had committed a fraud on the *HLA* court. This Court denied defendant's motion to compel, finding that Data General had not established a prima facie case of common law fraud. *RCA Corporation v. Data General Corp.*, No. 84–270–JJF, slip op. at 13 (D.Del. filed October 27, 1986). The nature of the defendant's claims have not changed since the Court's previous opinion, and, therefore, the Court again finds that the defendant has failed to prove that RCA committed fraud on the *HLA* court.

There is no doubt that RCA should have produced the FAA proposal during discovery in *HLA*. The document was certainly relevant to a possible on-sale bar defense that could have been asserted by the *HLA* defendants. However, the Court will not "infer from the failure to produce this particular document that some fraudulent scheme was in progress." *Id.* at 8. The *HLA* litigation was very complex and involved a tremendous amount of discoverable items. RCA's failure to produce the FAA proposal may have been careless but it was not fraudulent. RCA did produce documents that specifically referred to the FAA proposal, including the Helbig report, two engineers' notebooks, and a laboratory notebook. As previously stated, if RCA intended to suppress evidence of the FAA proposal, it would have suppressed all references to the proposal. *Id.* at 9. The defendant's claim concerning the FAA proposal is insufficient to establish a fraud on the *HLA* court.

Data General also claims that RCA's failure to produce the Stocker memo amounted to fraud on the *HLA* court. The Stocker memo refers to an FAA proposal using digital generation of video and suggests that the proposal may have occurred more than a year before the filing date for the Cole patent. RCA's patent counsel placed this memo in a patent approval file. Even though RCA's trial counsel produced some documents from this file during *HLA* discovery, they failed to produce this particular memo. The Court, as found in the prior opinion, finds RCA carelessly failed to produce the memo but no fraudulent scheme can reasonably be inferred from this type of conduct.

After hearing all the testimony on this issue, the Court concludes that RCA did not commit fraud on the *HLA* court. It should be noted, however, that RCA's careless conduct in failing to produce discoverable material in *HLA* is in no way condoned by the Court. A party has an obligation under the Federal Rules of Civil Procedure to respond in good faith to discovery requests seeking relevant evidence. Although RCA's failure to comply with its discovery obligations in *HLA* is not condoned, the record is insufficient to support a finding of fraud on the *HLA* court.

## B. *Inequitable Conduct During the Cole Patent Prosecution.*

Data General also contends that RCA's failure to cite relevant prior art and the FAA proposal during the Cole patent prosecution constitutes inequitable conduct, rendering the Cole patent unenforceable. A claim of inequitable conduct before the PTO can include fraud, "failure to disclose material information, or submission of false material information, with an intent to mislead." *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984). Initially, Data General must establish, by clear and convincing evidence, threshold proof of the materiality of the non-disclosed information and threshold proof of intent. *Id.* at 1559–60. *Accord FMC Corporation v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987).

Inventor Arthur Stocker submitted the Cole invention disclosure to RCA's patent department in early 1960. Although the original Patent Disclosure Data Sheet distinguishes the Cole invention from certain prior art devices, none of those devices were specifically named by the inventors. For instance, the inventors began their disclosure as follows:

> Television has been suggested, and sometimes used, to handle data for military command decisions. Where the original information is in pictorial form this is logical. But frequently, the original information is in binary digital form in an electronic computer and the television systems has taken such form as (a) a printer, a human plotter, and a camera; (b) a Charactron tube and a Permacon camera; or (c) a symbol pattern generator and a Graphecon storage/converter tube. These intermediaries are expensive and complex, and they result in loss of both definition and time.

This was a reference, albeit an ambiguous one, to intermediate storage approaches used in the prior art to display computer messages on television-type CRT's. Documents contemporaneous with the inventors' Invention Disclosure Data Sheet indicate that the inventors knew of the Gordon patent in February of 1960. This reference was sent to RCA's patent department in a February 1960 Data Displays Report that accompanied the Invention Disclosure. Also, in April 1960, Stocker learned of the Aero Neurtronics ("Amdahl") system which produced television video signals. In response, Stocker wrote and circulated to Cole and Corson, and eventually to the RCA patent department, an "addendum" to the original disclosure. His concern centered around the fact that he had "found that part of the described circuit [in the original disclosure] is sufficiently close to an equipment already on the market that there may be doubt on the main part of the invention. I have therefore written out a description of another approach we thought of last fall, but which we didn't include in the original disclosure."

In April of 1962, Stocker learned of Hazeltine's similar ("Fennimore") device,
which, unlike Amdahl, used a digital character generator with a page bit-map. These prior art references were made known to RCA's patent department and to Norton, the prosecutor of the Cole patent application. On July 26, 1963, Norton wrote to Washington, D.C., requesting a patent approval search. The scope of the search was "for references showing the digital generation of video signals where the digital signals are stored for later use in digital form with the video signal being generated directly from the digital signals upon a display being desired." Norton was, in essence, requesting a search for any intermediate storage prior art. On August 5, Norton received "copies of [nine] patents which represent the closest art we were able to find." One of these devices was the C. Jones patent, U.S. 2,987,715, a patent whose relevance has become the subject of some controversy in this case.

On October 8, 1963, Norton filed the Cole patent application with the United States Patent and Trademark Office. In the application, he failed to cite any of the prior art mentioned above. The approaches found in the prior art discussed above were only generically described in the patent application.

On May 16, 1966, RCA's patent attorney notified the Cole patent examiner of British Patent No. 905,951 ("Ellson"), and two other British patents. RCA's patent attorneys did not cite the FAA proposal to the PTO.

The non-disclosure of information to the PTO is "material" if "there is a substantial likelihood that a reasonable Examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *J.P. Stevens, supra,* 747 F.2d at 1559–60. RCA's failure to specifically cite any prior art in its initial patent application was certainly a material non-disclosure. In the application, RCA described the existing prior art in general terms but did not reference specifically any prior art of which it had knowledge. The Court finds that RCA was aware of the Gordon, Fenimore, Amdahl, and Jones patents. RCA contends that, when filing the

patent application, it did not believe any of the existing prior art was sufficiently "close" to the Cole device. RCA further contends that because the *HLA* court found that Fenimore and Amdahl did not anticipate or render Cole obvious, a reasonable examiner would not consider these patents to be material.

█ RCA's understanding of the duty of disclosure is incorrect. The fact that prior art may not render a device invalid because of obviousness or anticipation does not necessarily mean that the prior art is not "material" for disclosure purposes. *See A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1397–98 (Fed.Cir.1986). As this Court has previously stated, if prior art had to meet such a high standard, the entire inequitable conduct defense would be subsumed by the substantive analysis of section 102 and section 103. *Afros S.p.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1425 (D.Del.1987) *aff'd*, 848 F.2d 1244 (Fed. Cir.1988). RCA fails to comprehend that it is the examiner's task to determine whether a particular patent is sufficiently similar or different from the device on which a patent is sought. *See Armour & Co. v. Swift & Co.*, 466 F.2d 767, 779 (7th Cir. 1972) (applicant must present examiner with complete and accurate record).

Further, the Court finds RCA's failure to disclose the FAA proposal was material. As previously discussed, the FAA proposal raised the possibility of an on-sale bar defense to the Cole patent application. This is a fact of significant importance to an Examiner and should have been disclosed.

While Data General has satisfied the materiality element of the *J.P. Stevens* test, it has not produced a threshold showing of RCA's intent to defraud the PTO. Although RCA did omit prior art from its initial application, RCA did cite the British Ellson patent after the initial rejection of the application. The Ellson patent did disclose a digital symbol pattern generator similar to the other symbol pattern generator art. If RCA was attempting to conceal prior art from the examiner, it is unlikely that it would refer the examiner to the Ellson patent. *See In re Cole Patent Litigation*, 558 F.Supp. 937, 955–56 (D.Del. 1983) (disclosure of Ellson indicates lack of deceptive intent or gross negligence on RCA's part). The Court also finds no deceptive intent from RCA's failure to disclose the Jones patent because RCA never directly considered that patent in connection with the prosecution of the Cole patent. *See Id.* at 955–56. As for the FAA proposal, Data General introduced no evidence that anyone from RCA intentionally suppressed or concealed the proposal from the PTO.

Because Data General has failed to establish a threshold showing of RCA's intent to mislead the PTO, the Court will reject Data General's defense of unenforceability based on RCA's conduct before the PTO.

## V. INFRINGEMENT

█ RCA avers that the accused terminals of Data General literally infringe claims 1–3 of the Cole patent. RCA must prove infringement of the Cole claims by a preponderance of the evidence. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). Since the Cole claims are expressed in means plus function form, the claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. In determining the literal scope of each means described in the Cole patent, the critical test is "whether the allegedly infringing device employs substantially the same means to accomplish substantially the same result in substantially the same way." *Hale Fire Pump Co. v. Tokai, Ltd.*, 614 F.2d 1278, 1283 (C.C.P.A.1980) (*citing Graver Tank & Mfg. Co. v. Linde Air Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). Based on the infringement testimony presented at trial, I conclude that Data General accused terminals are the direct equivalent of the means plus function claims in the Cole patent.

Each Data General terminal is part of a display system for generating character patterns for a display on a device using a television raster scan-line pattern, with

each character pattern displayed in a single character space (the same means described in Cole Claim 1). As described in Cole Claims 2 and 3, Data General terminals display a message composed of certain character patterns on a display device that exhibits a television raster scan pattern, wherein each character pattern is manifested by a digitally coded two level video signal.

Data General's terminals use a combination of a read-only memory ("ROM") and a shift register to perform, in all significant respects, the operation of the digital-to-video generator in Figures 1 and 2 of the Cole patent. The ROM/shift register receives the digital character code, scan line count input, and dot position count input, and digitally generates the digital video output. Data General contends that its terminals have no "means for generating position counts" and, therefore, cannot infringe Cole. However, the terminals do use a dot clock and dot counter in their timing and control circuitry. The dot counter counts through the dots of the character space and cycles through a set of dots corresponding to the dot positions within a character space, and then generates a shift/load signal count. The dot clock signal and the shift/load signal are conveyed to the shift register as an input and the shift register subsequently converts the parallel dot-slice into a serial video signal.

Data General also attempts to distinguish Cole on several other grounds, none of which have any substance. For instance, Data General asserts that its shift register does not perform a logical function and constitutes "intermediate storage." This same argument was unsuccessfully advanced in the *HLA* litigation. The shift register is not an intermediate storage system, but rather is a functioning part of the character generator. As in the Cole patent, the character codes in a row are repeatedly presented to the character generator which directly generates a real time video signal. *See In re Cole Patent Litigation,* 558 F.Supp. at 956. The shift register receives a group of bits defining the dot pattern of a character slice and delivers the video bits in series at its output termi-nal. *Id.* The shift register does not, at any point, "store" the video bits; the bits simply pass through the shift register in a microsecond or less. Unlike the systems in the Amdahl or Dirks patents, the ROM/shift register in Data General's terminals generates a real time video signal in direct response to the inputted character codes and the video signal generated is in synchronization with a display device exhibiting a television raster scan pattern.

In sum, I conclude that the structure and function of the identified Data General terminals are the direct equivalent of the invention claimed in Cole claims 1–3. The numerous other features Data General asserts in an effort to distinguish Cole are merely minor improvements or enhancements of the Cole patent and do not alter the fact that both devices achieve substantially the same result in substantially the same way with substantially the same means under *Graver Tank.* If the Cole patent were valid, the identified Data General terminals would infringe claims 1–3.

## VI. RCA AND DATA GENERAL NEGOTIATIONS

RCA has alleged that Data General willfully infringed the Cole patent and also breached the parties' license agreement by failing to pay royalties under the agreement. Data General has countered that laches bars RCA from recovering any damages that may have accrued prior to the parties' license agreement. In order to consider each of these claims, it is necessary to first recount the business dealings between RCA and Data General prior to the commencement of this action.

In December, 1972, Data General announced that it would begin production of its first two in-house video display terminals. Prior to 1972, Data General had purchased display terminals for use with its computers. On May 3, 1973, RCA learned of Data General's terminals and notified Data General by letter of the Cole patent. On October 2, 1973, RCA's licensing representative, Robert E. Peterson, met with Data General's patent attorney, Jacob

Frank, to discuss the workings of the Cole patent and RCA's ongoing license negotiations with other companies. At this meeting, RCA also gave Data General a list of prior art and a sample license agreement. RCA contacted Data General once a year from 1974 to 1976, and twice in 1977, in order to discuss RCA's licensing success with other companies and to provide Data General with sample license agreements. Data General did not, during this series of meetings, indicate any intention of entering a license agreement with RCA.

At some point between 1974 and 1977, RCA told Data General it should consider a technical comparison of Cole and Data General's terminals and should undertake a validity study of the Cole patent. Frank, Data General's patent attorney, completed a validity study by early 1978, and concluded that the British Dirks patent anticipated the Cole patent. Data General also employed an outside attorney Robert O'Connell to conduct an independent study of Cole. In his written report of March, 1978, O'Connell also concluded that Cole was fully anticipated by Dirks.

In May, 1978, RCA met with Data General and explained in detail how Data General's ROM/shift register infringed RCA's Cole patent. In July, 1978, RCA initiated its patent infringement suit against ADDS. RCA informed Data General of the *HLA* action and indicated its intention to "press our claims against other unlicensed manufacturers who make use of the invention."

RCA and Data General continued to discuss a license agreement off and on into 1980. In 1980, at Data General's request, O'Connell conducted an infringement study and concluded that it was reasonable that Data General's terminals did not infringe Cole. O'Connell performed another infringement evaluation in September, 1981, and again concluded in his written report "that a reasonable basis exists for concluding that Data General products do not infringe ... the Cole patent."

After years of negotiations, the parties finally signed a license agreement on September 30, 1981. Data General apparently signed the agreement because RCA intended to raise their royalty rate in license agreements signed after that date. By April, 1984, Data General had paid no royalties under the license agreement, contending that its terminals did not infringe the Cole claims. On May 10, 1984, RCA filed this lawsuit and noticed Data General of its intent to terminate the license agreement.

A. *Laches.*

Data General has asserted laches as an affirmative defense to RCA's demand for "pre-license damages." Data General contends that RCA delayed unreasonably in bringing this action and this delay has prejudiced Data General in attempting to defend this suit. Data General asserts prejudice from the fact that because of RCA's delay, witnesses have died, memories of key witnesses have faded, and documents have been destroyed.

In asserting the defense of laches, Data General must prove "(1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice ... resulting from this delay, but the longer the delay, the less need there is to show specific prejudice." *Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir. 1984). If a patent owner delays more than six years in bringing suit, the burden shifts to the patent holder to prove the reasonableness of his delay and the lack of injury to the defendant. *Id.* at 742. In this case, RCA learned of Data General's terminals in 1973 but waited eleven years to bring this suit. This delay creates a presumption of unreasonable delay and prejudice to Data General which RCA must rebut. RCA contends that this presumption is rebutted by several facts, including the bad faith and willful infringement of Data General, the extensive license negotiations between the parties, and RCA's calculated decision to litigate the *HLA* action before the instant suit.

The Court finds that RCA's delay in instituting this infringement suit is justifiable on two grounds. First, RCA was reasonable in believing that it could avoid litigation with Data General by negotiating a

license agreement. When RCA first learned of Data General's new terminals in 1973, it promptly notified the defendant of the Cole patent and initiated negotiations for a license agreement. Between 1973 and 1981, when the agreement was finally signed, RCA diligently pursued Data General in an effort to license the Data General terminals. The parties met in person at least ten times during this period and also communicated by letter on numerous occasions. RCA's genuine effort to resolve its dispute with Data General through negotiations provides a justifiable excuse for the eleven year delay in commencing this suit. *See* 4 D. Chisum, Patents § 19.05.

Second, RCA's delay is excusable because RCA pursued its *HLA* infringement action from 1978 to 1984. RCA noticed Data General in 1978 of the *HLA* suit and also indicated that it would continue to pursue claims against unlicensed manufacturers using the Cole invention. It was reasonable for RCA to conserve litigation expenses by first testing the validity and scope of the Cole patent in *HLA* before seeking recovery against other potential infringers. *See Mainland Industries v. Standal's Patents Ltd.,* 799 F.2d 746, 749 n. 2 (Fed.Cir.1986) (court implies that foreign patent litigation could be considered for purpose of determining excusable delay); 4 D. Chisum, Patents § 19.05. Shortly after the conclusion of the *HLA* appeal, RCA instituted the instant action for infringement and breach of license agreement.

In addition to rebutting the presumption of unreasonable delay, the Court also finds that RCA has rebutted the presumption of material prejudice due to the delay. First, RCA's decision to litigate the *HLA* action prior to this suit may have actually benefited Data General. Due to the similar issues raised in both actions, Data General was able to rely on the *HLA* record for extensive discovery and assistance in plotting its trial strategy. I conclude there was available to Data General sufficient testamentary and documentary evidence to defend this suit. Additionally, I find no evidence that RCA's filing of this suit altered the manner in which Data General conducted its business.

I, therefore, conclude that the defense of laches does not limit any damage recovery RCA could obtain if the Cole patent were valid.

B. *Willful Infringement.*

 ██ RCA seeks a trebling of any damage award on the ground that Data General willfully infringed the Cole patent. Assuming that the Cole patent were valid, the Court would still not find willful infringement on this record.

In order to show willful infringement, RCA must prove by clear and convincing evidence that under the totality of the circumstances, Data General had no reasonable basis for believing it had a right to engage in its course of conduct. *See Machinery Corp. v. Gullfiber A.B.,* 774 F.2d 467, 472 (Fed.Cir.1985); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 628 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). In this case, Data General procured two legal opinions on the validity of the Cole patent and two legal opinions on the question of infringement. All these opinions supported Data General's belief that the Cole patent was either invalid or not infringed by Data General's terminals. In addition, during a portion of the period in which Data General allegedly infringed Cole, Data General was involved in license negotiations with RCA. These continued negotiations between 1973 and 1981 support a finding that Data General was trying in good faith to avoid infringement of the Cole claims. *See King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 867 (Fed.Cir.1985) (negotiations for a license agreement may support a finding that infringer acted in good faith). On this set of facts, I can ascertain no basis for a finding of willful infringement by Data General.

C. *Breach of License Agreement.*

 ██ RCA requests that its license agreement with Data General be declared rescinded or, in the alternative, requests

that it receive damages to compensate for the defendant's alleged breach of the license agreement. RCA alleges that Data General materially breached the license agreement by failing to pay any royalties on its sale of digital-data display equipment. Data General states that it did not breach the agreement because it was only required to pay royalties on equipment "covered by any claim" of the Cole patent and, since Data General contended that its manufactured terminals were not covered by Cole, it concluded that no royalty payments were owed under the terms of the license agreement. The position Data General took was supported by the opinion of outside consultants. In *Lear, Inc. v. Adkins,* 395 U.S. 653, 673–74, 89 S.Ct. 1902, 1912–13, 23 L.Ed.2d 610 (1969), the United States Supreme Court held that a licensee was not obligated to pay royalties under a license agreement if the underlying patent is declared invalid by a court.

Since the Court has concluded that the underlying patent is invalid, Data General has no duty to pay royalties under the license agreement. Absent a valid patent, RCA cannot support its contention that a material breach of the license agreement has occurred. Therefore, the Court must deny RCA's request that the agreement be declared rescinded or, in the alternative, that RCA be awarded damages for Data General's alleged breach of the agreement.

## VII. CONCLUSION

For the reasons discussed above, the Court concludes that the Cole patent was not obvious nor anticipated by the prior art. Further, the Court concludes that Data General has not proven RCA committed fraud on the *HLA* Court or before the PTO during the prosecution of the Cole patent. However, the Court does conclude that Data General has established that the Cole patent is invalid because it was "on-sale" more than one year before the filing of the patent application in violation of section 102(b).

If the patent were valid, the Court concludes that the Data General accused terminals would infringe claims 1 through 3 of Cole, but RCA has not shown willful infringement which would warrant an increased damage award, however, RCA would not be limited in its recovery by the doctrine of laches.

Finally, the Court concludes that neither recission of the license agreement between the parties or calculation of damages from the alleged breach of the agreement are appropriate.

An Order consistent with this Opinion will be entered.

APPENDIX A

Oct. 3, 1967 D. A. COLE ETAL 3,345,458

DIGITAL STORAGE AND GENERATION OF VIDEO SIGNALS

Filed Oct. 16, 1963 4 Sheets-Sheet 1

Fig.1.

INVENTORS:
DONALD A. COLE,
CARL R. CORSON &
ARTHUR C. STOCKER

BY Edward J. Norton

Attorney

APPENDIX B

Oct. 3, 1967 D. A. COLE ETAL 3,345,458

DIGITAL STORAGE AND GENERATION OF VIDEO SIGNALS

Filed Oct. 16, 1963 4 Sheets—Sheet 2

*Fig. 2.*

INVENTORS:
DONALD A. COLE,
CARL R. CORSON &
ARTHUR C. STOCKER
BY Edward J. Norton
Attorney

APPENDIX C

Oct. 3, 1967 D. A. COLE ET AL. 3,345,458

DIGITAL STORAGE AND GENERATION OF VIDEO SIGNALS

Filed Oct. 16, 1963 4 Sheets-Sheet 4

Fig. 4.

INVENTORS
DONALD A. COLE
CARL R. CORSON &
ARTHUR C. STOCKER
By Edward J. Norton
Attorney