**BRISTOL LOCKNUT COMPANY,**
**Plaintiff/Appellee/Cross-Appellant,**

v.

**SPS TECHNOLOGIES, INC.,**
**Defendant/Appellant/Cross-Appellee.**

**CA Nos. 80–5234, 80–5236, 80–5240 and 80–5241.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 6, 1981.

Decided May 24, 1982.

Rehearing Denied June 28, 1982.

John W. Logan, Jr., Ferrill & Logan, Fort Washington, Pa., for SPS Technologies, Inc.

R. Douglas Lyon, Lyon & Lyon, Los Angeles, Cal., for Bristol Locknut Co.

Before HUG, TANG, and FARRIS, Circuit Judges.

FARRIS, Circuit Judge:

## BACKGROUND

The validity and infringement of two patents and a trademark held by SPS Technologies, Inc. are at issue. The Skidmore Patent No. 3,208,494 claims and describes what is known in the industry as a prevailing torque locknut.[1] A locknut differs from a free spinning nut in that it requires greater effort to remove it from a bolt. Because locknuts will not vibrate loose, they are widely used in the automotive industry in critical places on vehicles. The Burt Patent No. 2,955,301 describes and claims a tool for converting certain free spinning nuts into locknuts by deforming the nut's conical end.[2]

SPS Technologies, Inc. (formerly Standard Pressed Steel Company) entered into a licensing agreement with Bristol Locknut Company (formerly Magnolia Screw Products, Inc.). Bristol Locknut was licensed to sell, under SPS's trademark "Conelok," the Skidmore locknut and locknuts made by the Burt tool.

Six years later, Bristol Locknut renounced the licensing agreement and brought a declaratory judgment action, seeking a determination that the patents were invalid and not infringed by Bristol Locknut's manufacturing practices. SPS then brought an action for breach of contract and infringement of its patents and trademark. Both parties made various claims for royalties. The actions were consolidated by the district court, which found that both patents were invalid and were not infringed and that the trademark was not infringed. It held that Bristol Locknut was not entitled to a return of royalties, and that Bristol Locknut had no obligation to pay SPS the royalties it withheld and underreported. Both parties appealed. We affirm in part and reverse in part.

## SUMMARY

We agree with the court's holding that both patents were invalid. We need not reach the question of whether the patents were infringed.

Bristol Locknut's obligation to pay royalties arises out of contract and federal patent law principles. SPS performed fully and Bristol Locknut received substantial benefit under the licensing agreement. Consequently, Bristol Locknut's obligation to pay the full royalties owed under the contract continued until it challenged the validity of the patents. To hold otherwise, under these facts, would be inequitable and would undermine federal patent law policy.

We agree with the court's holding that the trademark was not infringed. We do not address Bristol Locknut's claim that the trademark was invalid, because that issue was not raised at trial.

## ANALYSIS

### I. MODIFICATION OF THE PRETRIAL ORDER

As a preliminary matter, SPS claims the court improperly departed from the pretrial order. A pretrial order governs the subsequent course of the action unless modified to prevent manifest injustice. *Higgins v. Harden*, 644 F.2d 1348, 1353 (9th Cir. 1981). Here, the trial court properly

---

1. The Skidmore Patent describes a stubby type of indented tapered crown locknut known as a "high-hex" locknut. It is distinguished from standard locknuts by the nonshouldered shape of its crown.

2. The Burt tool is used to deform the conical extension of a nut. The tool has an inwardly tapered recess at one end for receiving the conical portion of the nut. The inside wall of the tool's recess area has three uniformly spaced projections. Depressions are cut into the wall of the tapered recess, between the projections, to form shallow relief areas. The tool is pressed against the nut to deform the nut's conical end and threaded bore, which prevents the nut from easily loosening from a bolt.

departed from the pretrial order because it found that "[i]t was a mistake to go to trial on that pretrial conference order. It helped not at all to limit the issues, define the issues, and make clear what the true issues were that were to be tried before the Court." SPS has not shown that any issues were wrongfully included or excluded, or that its interests were prejudiced by the court's action. We find no error in the court's departure from the pretrial order.

## II. VALIDITY OF THE PATENTS

■ Although patent validity is a question of law, *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976); *M–C Industries, Inc. v. Precision Dynamics Corp.*, 634 F.2d 1211, 1213 (9th Cir. 1980), a patent enjoys a presumption of validity, 35 U.S.C. § 282 (1976), which is rebuttable only by clear and convincing evidence, *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 1271 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976); *Del Mar Engineering Laboratories v. Physio-Tronics, Inc.*, 642 F.2d 1167, 1173 (9th Cir. 1981).

The trial court based its holding that both patents were invalid for obviousness upon 35 U.S.C. § 103 (1976), which provides:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

■ Obviousness is a question of law based on three factual determinations: 1) the state of the prior art, 2) the differences

between the challenged patent and the prior art, and 3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

■ SPS contends that the court made inadequate findings on these issues. While more specific findings would have facilitated review, the record demonstrates that the court considered each of them.

Although "strict observance" of the factual inquiries set forth in *Graham* is necessary ... this court has not required a precise articulation of the *Graham* analysis where a reading of the court's entire opinion, in the context of the record, "reveals that the district court in fact appropriately examined the prior art" in comparison with the patent in question and "took into account the level of ordinary skill in the pertinent art". *Satco, Inc. v. Transequip, Inc.*, 594 F.2d 1318, 1321 (9th Cir. 1979), *cert. denied*, [444 U.S. 865], 100 S.Ct. 137, 62 L.Ed.2d 89 (1979). *Palmer v. Orthokinetics, Inc.*, 611 F.2d 316, 319 (9th Cir. 1980). *Accord M–C Industries*, 634 F.2d at 1213. Here, the court received evidence and heard testimony from several witnesses about the state of the prior art, the differences between that art and the disputed patents, and the level of ordinary skill in the art.[3] Based on the evidence before it, the court could properly conclude that the patents were invalid. Its findings on these issues are not clearly erroneous. *See M–C Industries*, 634 F.2d at 1213; *Saf-Gard Products, Inc. v. Service Parts, Inc.*, 532 F.2d 1266, 1272 (9th Cir.), *cert. denied*, 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976).

---

**3.** The court had before it evidence of prior art relevant to the Burt patent, including the Rufp Patent No. 1,903,922, Brackett Patent No. 2,337,797, Cole Patent No. 2,586,786, and Engstrom Patent No. 2,679,879. Each of these involves a similar tool used to produce a locknut by deforming a nut. The distinguishing feature of the Burt patent is the claim that, upon impact with the nut, the recesses in the tool's head completely fill in. The court heard testimony from several qualified witnesses that the Burt tool did not completely fill in the recesses, as claimed in the substantially identical claims

no. 1 and 2 of the patent. The court also heard testimony that it would not be a beneficial or patentable advance even if the recesses did completely fill in.

The court had before it evidence of the prior art relevant to the Skidmore patent, including the Ahlers Patent No. 1,467,824, Tripp Patent No. 2,352,668, and Hosking Patent No. 2,452,-192. The court also heard testimony from witnesses in the field about the differences between the Skidmore patent and the prior art. The primary difference was in the shape of the nut.

SPS argues that the court gave inadequate weight to the patents' commercial success. We reject the argument. Although commercial success may be a relevant secondary indication of obviousness, *Graham v. John Deere Co.*, 383 U.S. at 17–18, 86 S.Ct. at 693–694, "commercial success without invention will not make patentability," *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). Further, this secondary factor is considered only when the three primary factual determinations do not dispose of the obviousness issue. *See SSP Agricultural Equipment, Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1101 (9th Cir. 1979).

Where, as here, the obviousness of the patent is in issue, the presumption of a patent's validity will disappear if the applicant failed to disclose prior relevant art to the patent office. *Kamei-Autokomfort v. Eurasian Automotive Products*, 553 F.2d 603, 605 (9th Cir.), *cert. denied*, 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977). SPS alleges that the court erred in finding that SPS failed to disclose relevant prior art. The record reflects that the undisclosed prior art included an identically shaped free spinning nut.[4] The court's finding was not clearly erroneous. *See M–C Industries*, 634 F.2d at 1213. In any event, the court could properly find from the evidence that any presumption of validity either patent might have had was clearly and convincingly rebutted. *See Saf-Gard Products*, 532 F.2d at 1271.

## III. THE PARTIES' CLAIMS FOR ROYALTIES

### A. BACKGROUND

Under the licensing agreement, Bristol Locknut agreed to pay SPS a royalty based on a percentage of the sales of Skidmore locknuts and locknuts manufactured by the Burt tool. In return, SPS agreed not to sue for patent infringement.

The original agreement was signed on December 11, 1970. Bristol Locknut started making royalty payments in 1971. It was purchased by Frank Klaus in late 1972 and sales were thereafter underreported and the royalties consequently underpaid. On January 28, 1977, Bristol Locknut wrote to SPS, explaining it was delaying payment of the fourth quarter 1976 royalties until it received copies of SPS's licensing agreements with other locknut manufacturers. Bristol Locknut never resumed payment of royalties, but soon thereafter filed this action, on March 22, 1977, for a declaratory judgment that both patents were invalid and not infringed. SPS's separate action for breach of contract and infringement of its patents and trademark was consolidated. Bristol Locknut sued for a return of all royalties it had paid, and SPS sued for the unpaid royalties that accrued during the two fiscal quarters before the action was filed. SPS also sued for the underpaid royalties Bristol Locknut was obligated to pay. The parties stipulated that the total amount of underreported and unpaid royalties that accrued to the date of filing totalled $69,-396.43.

The district court left the parties as they were. It held that since both patents were invalid and the trademark not infringed, SPS was not entitled to any additional royalties. We assume the court concluded that the holding of invalidity terminated Bristol Locknut's obligation to pay any further royalties. The court also held that, under the rationale of *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), and *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309 (9th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977), Bristol Locknut was not entitled to a reimbursement of royalties already paid.

---

4. Ahlers Patent No. 1,467,824 was mentioned in the rejection of Skidmore's original patent application, but was not included in the references cited by the Patent Examiner when the amended patent application was approved four and one-half years later. Because "there are no official actions or papers of the Examiner from which it confidently may be inferred that he had ever acquired actual knowledge of the [undisclosed patent].... the presumption of validity of the patent was overcome." *Ceco Corporation v. Bliss & Laughlin Industries, Inc.*, 557 F.2d 687, 691 (9th Cir. 1977).

We agree that Bristol Locknut was not entitled to a refund of royalties paid, but we reverse the holding that it owes no further royalties. Bristol Locknut is obligated to pay SPS the full amount of underreported royalties and the unpaid royalties which accrued before it challenged the patents' validity by bringing this action.

## B. RETURN OF ROYALTIES PAID BY THE LICENSEE

■ Bristol Locknut argues that it is entitled to a refund of royalties paid under an invalid, and therefore void patent. We reject the argument.

In *St. Regis Paper Co. v. Royal Industries*, 552 F.2d 309, 314 (9th Cir.), *cert. denied*, 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977), we held that a licensee was not entitled to a refund of royalties paid before it challenged the patent's validity. *St. Regis* involved the typical situation in which a license agreement was entered into after the patent was issued. After four years, the licensee stopped paying royalties. Nine months later, it filed an action contesting the patent's validity and sought a return of royalties paid under the agreement. We found that the federal policy in favor of the prompt and early adjudication of the validity of patents, as articulated in *Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969),[5] overrode countervailing state laws:

> [T]he possibility of a royalty refund might delay such a determination [of a patent's validity]. The possibility of obtaining a refund of all royalties paid might induce a manufacturer to accept a license based on a patent of doubtful validity, derive the benefits of suppressed competition which the patent affords, and challenge validity only after the patent's expiration. The licensee would have a chance to regain all the royalties paid

while having enjoyed the fruits of the license agreement. Therefore, if a refund were permitted, licensees who were only recently unmuzzled by *Lear* would again be silenced by economic self-interest rather than by state law.

*St. Regis*, 552 F.2d at 314.

Other circuits have also read *Lear* to deny a refund of royalties paid by a licensee. *E.g., American Sterilizer Co. v. Sybron Corp.*, 614 F.2d 890 (3d Cir.), *cert. denied*, 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097 (7th Cir. 1975); *PPG Industries, Inc. v. Westwood Chemical, Inc.*, 530 F.2d 700 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976).

Bristol Locknut argues that it is entitled to a reimbursement of all royalties because the district court found both patents not infringed, as well as invalid. Unlike patent validity questions, infringement is a question of fact, not law. Bristol Locknut contends that since both parties were operating under a mutual mistake of fact, the licensing agreement should therefore be rescinded and all royalties returned. We understand but reject the argument. We affirm the holding of invalidity and need not review the finding of noninfringement, *Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.*, 444 F.2d 295, 301 (9th Cir. 1970), since noninfringement here would not affect our holding that Bristol Locknut is not entitled to a reimbursement of royalties. Because an invalid patent cannot be infringed, *Wham-O-Mfg. Co. v. Paradise Manufacturing Co.*, 327 F.2d 748, 751 (9th Cir. 1964), Bristol Locknut's logic would permit every licensee who successfully challenged the validity of a patent to demand a reimbursement of royalties because of the consequent noninfringement of that patent.

---

5. In *Lear*, the Supreme Court relied on the strong federal policy of promoting the free competition of unpatentable ideas when it held that a patent licensee was not estopped to challenge the validity of the licensed patent. *Lear* involved the payment of royalties under a licensing agreement entered into before a patent was issued. The licensee stopped paying royalties before the patent application was approved. The Court held that the licensee was not required to continue paying royalties until the patent's validity was finally adjudicated, because this would frustrate the overriding federal policy of promoting the prompt and early adjudication of the validity of patents.

Such a result would undermine the stated policies of *Lear* and *St. Regis*, and would also promote an injustice where, as here, both issues of invalidity and noninfringement rest on the same asserted technical defects in the patents.[6]

Bristol Locknut's argument is novel and, under these facts, unpersuasive. Here, Bristol Locknut fully "enjoyed the fruits of the license agreement." *St. Regis*, 552 F.2d at 314. We do not decide whether in a different situation involving a valid but not infringed patent, the argument would also fail.

### C. PAYMENT OF ROYALTIES UNTIL THE PATENTS' VALIDITY WAS CHALLENGED

■■ A licensee remains obligated to pay all royalties under a licensing agreement which accrue until it takes an affirmative step that would prompt the early adjudication of the validity of the patent, such as filing an action contesting the patent's validity or notifying the licensor that the payments were being stopped because the patent was believed to be invalid.[7] *PPG Industries, Inc. v. Westwood Chemical, Inc.*, 530 F.2d 700, 701 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976); *accord, American Sterilizer Co. v. Sybron Corp.*, 614 F.2d 890, 895–98 (3d Cir.), *cert. denied*, 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980) (the crucial date for terminating the obligation to pay royalties occurs when the licensee makes a prompt challenge to the patent, not necessarily when the action is filed); *cf. St. Regis*, 552 F.2d at 314 (a licensee is "not entitled to the refund of royalties paid before it challenged the validity of the patent"); *Kraly v. National Distillers & Chemical Corp.*, 502 F.2d

1366, 1372 (7th Cir. 1974) (the obligation to pay royalties stopped when the licensee repudiated the license agreement by ceasing to represent that its product was licensed under the patent); *see also USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097, 1099–100 (7th Cir. 1975).

■■ Here, Bristol Locknut stopped paying royalties seven weeks before it filed suit. Because its letter to SPS did not prompt the early adjudication of the patents' validity, it remained obligated to pay royalties until it filed this declaratory judgment action to contest the patents' validity.

### D. PAYMENT OF THE UNDERREPORTED ROYALTIES

■■ Before it ceased paying royalties because of doubts about the patents' validity, Bristol Locknut engaged in a deliberate and systematic underreporting of sales, thereby reducing the royalties paid to SPS. Bristol Locknut contends it has no obligation to pay royalties on the underreported sales that would otherwise be due if the patents were valid and not infringed. We reject the argument. To permit Bristol Locknut to retain the royalties it owed SPS would be inequitable and would undermine federal patent law policy. Bristol Locknut's contractual obligation to pay royalties terminated only after it ceased paying royalties and clearly notified SPS it was contesting the patents' validity. Just as the subsequent determination of the patents' invalidity did not affect Bristol Locknut's duty to pay royalties before it challenged the patents' validity, it does not affect the duty to pay the full amount of royalties owed under the contract. *Cf. Ransburg Electro-Coating Corp. v. Spiller & Spiller,*

---

**6.** Bristol Locknut claimed that the Skidmore patent was invalid because, contrary to the patent claim, it did not have areas of greater relative density. Because the district court found that the density of metal is constant, Bristol Locknut claimed that neither it nor anyone else could make a locknut consistent with such a claim. The Burt patent's validity was challenged on the ground that the tool did not completely fill in the recesses as claimed by the patent. On the issue of noninfringement Bristol Locknut claimed, *inter alia*, that since its

tool did not completely fill in the recesses, it could not infringe the patent claims.

**7.** Either method of giving adequate notice would fulfill the strong federal policy of prompting an early adjudication of patent validity. To mechanically require that a lawsuit be filed in order to suspend the obligation to pay royalties would place an undue burden on the courts, hinder settlement, and is not the only means of effectuating federal patent law policy.

*Inc.*, 489 F.2d 974, 978 (7th Cir. 1973) (an infringement settlement agreement was enforced even though the patent was later declared not infringed, since a contrary result would be inconsistent with the *Lear* policy favoring early challenges to patent validity).

A contrary result would also be inequitable. Here, Bristol Locknut received the full benefit of the licensing agreement despite the later adjudication of the patents' invalidity. Bristol Locknut was licensed to sell the locknuts without being sued by SPS for infringement. For six years Bristol Locknut enjoyed the benefits of the patent and developed a substantial business, economies of scale, and customer goodwill. It cannot avoid its contractual obligation by deliberately underreporting its sales. *See Kraly v. National Distillers & Chemical Corp.*, 502 F.2d 1366, 1372 (7th Cir. 1974).

## IV. VALIDITY OF THE TRADEMARK

Neither party challenges the court's finding that Bristol Locknut did not infringe SPS's registered trademark "Conelok." In its order holding that the trademark was not infringed, the court stated, "[T]he word 'conelok' is used in the locknut industry to identify a particular construction of locknut and is not a designation of source of origin." In its appeal Bristol Locknut contends that because the court found the trademark "generic" it was error not to also enter a finding of invalidity. We decline to address this issue. It was neither raised nor litigated at trial. The court's statement, upon which Bristol Locknut relies, was unnecessary to its holding of noninfringement.

## CONCLUSION

We find no error in the district court's departure from the pretrial order, and we affirm its holdings that 1) both patents were invalid, and 2) Bristol Locknut was not entitled to any refund of royalties paid.

We reverse the holding that Bristol Locknut is not obligated to pay SPS the $69,-396.43 representing the underpaid royalties and the royalties not paid during the two fiscal quarters before it filed this action.

AFFIRMED IN PART AND REVERSED IN PART.