**RCA CORPORATION,**
**Plaintiff–Appellant,**

v.

**DATA GENERAL CORPORATION,**
**Defendant/Cross–Appellant.**

Nos. 88–1571, 88–1589.

United States Court of Appeals,
Federal Circuit.

Oct. 11, 1989.

See also 730 F.2d 1440.

William J. Gilbreth, of Fish & Neave, New York City, argued for plaintiff-appellant. Robert C. Morgan, Norman H. Beamer and Ron E. Shulman, of Fish & Neave, and Joseph A. Tate, of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.

Douglas E. Whitney, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., argued for defendant/cross-appellant. Jack B. Blumenfeld and Mary B. Graham, of Morris, Nichols, Arsht & Tunnell, of counsel.

Before NIES and MAYER, Circuit Judges.[1]

NIES, Circuit Judge.

RCA Corporation appeals from the final judgment of the United States District Court for the District of Delaware, *RCA Corp. v. Data General Corp.,* 701 F.Supp. 456, 8 USPQ2d 1305 (D.Del.1988) (Farnan, J.), denying RCA any relief against Data General Corporation (DGC) in a suit for infringement of RCA's United States Patent No. 3,345,458 (Cole or '458 patent) and for rescission of a license agreement between the parties or for breach of contract damages. Each party challenges virtually every ruling of the district court unfavorable to it, including the denial of DGC's request for attorney fees.

Of the numerous issues presented to us for review, the issue of the on-sale bar is dispositive with respect to RCA's claim of patent infringement. We agree with the district court that DGC presented clear and convincing proof supporting the legal conclusion that the invention of claims 1–3 [2] of

---

1. Circuit Judge Rich heard oral argument in these appeals but subsequently recused himself, taking no position in the decision of this case.

2. For convenience we refer to the "Cole invention" throughout this opinion although three claims, *i.e.,* three inventions are involved and other claims are not in suit. RCA's arguments do not require that we treat the claims separately. Claim 1 reads:

1. A display system for generating character patterns for display on a display device that exhibits a television raster scan-line pattern, each character pattern being displayed in one character space,
means responsive to a certain character code for applying to a certain selected lead an output signal having a duration substantially equal to the scanning time in said scan-line direction through one character space,

the '458 patent, the claims in suit, were "on-sale" within the meaning of 35 U.S.C. 102(b) (1982), and, thus, we affirm its judgment that those claims are invalid.[3] We also affirm the court's judgment on RCA's contract claims and the denial of attorney fees to DGC.

## I.

### PATENT COUNT

#### Background

The invention involved in this case relates to a display system for computer generating alphanumeric characters on a standard raster scan television monitor. The Cole patent claims a system for decoding digital computer symbol codes representing a message and converting them using digital techniques into digital video signals. The district court in a detailed opinion fully sets out the technology relating to the claimed invention at issue. *See RCA Corp. v. Data Gen. Corp.*, 701 F.Supp. 456, 8 USPQ2d 1305 (D.Del.1988). In a prior case involving the same patent, this court has also explained the technology.[4] Another detailed explanation is unnecessary for analysis of the on-sale issue.

The district court held that RCA's submission of a proposal on October 8, 1962, in response to a Request for Proposal put out by the Federal Aviation Administration (FAA) for character generation equipment for use in air traffic control centers, was a definite offer to sell the Cole invention.

RCA's proposal was made more than one year prior to the filing date of the application for the Cole patent, the latter date being October 16, 1963. The court further held that the Cole invention had been reduced to practice prior to the FAA proposal. In view of these findings, the district court concluded that the Cole patent was invalid by reason of the statutory on-sale bar.

While rigorously disputed at trial, RCA no longer challenges that the Cole invention was reduced to practice prior to making its FAA proposal, although it attempts to equivocate by saying that it concedes reduction to practice only for purposes of this appeal. Because the district court resolved a major conflict on this issue which is critical to understanding the court's on-sale ruling, we will recount the circumstances underlying the district court's determination that the Cole invention was reduced to practice prior to October 1962.

In the previously mentioned prior litigation, RCA sued Hazeltine, Lear Siegler and Applied Digital Data Systems for infringement of the same Cole patent (the *HLA* litigation). During the *HLA* trial, RCA called Robert Clark, an engineer at RCA Canada, as a witness to establish that the Cole invention was commercially successful and feasible. In his testimony at the *HLA* trial and in Clark's first deposition *in this case*, Clark testified consistently that in connection with a demonstration to Air Canada in September 1962, he had reduced the Cole invention to practice.[5] In what

---

means for generating scan-line select counts in synchronism with the scan-lines of said raster, each scan-line count having a duration substantially equal to that of a raster scan-line,
 means for generating position counts which occur successively during a scan along a scan-line through a character space, and means for causing said output signal appearing on said selected lead, said scan-line counts and said position counts to supply to said display device a selected character pattern.
 Claim 2 (and dependent claim 3) specifies "generating means ... for *digitally* generating" the video signal (emphasis added).

3. The pertinent portion of 35 U.S.C. § 102(b) provides:
 **§ 102 Conditions for patentability; novelty and loss of right to patent**

A person shall be entitled to a patent unless. . . .
 (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States. . . .

4. *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 221 USPQ 385 (Fed.Cir.1984). At the trial level, that litigation is identified as *In re Cole Patent Litigation*, 558 F.Supp. 937, 217 USPQ 421 (D.Del.1983).

5. A more complete recitation of Clark's testimony of the events culminating in the reduction to practice of the Cole invention appears in the district court's opinion. *See RCA Corp.*, 701 F.Supp. at 465, 8 USPQ2d at 1312.

the district court characterized as a "bewildering departure," Clark, at trial here, disavowed his prior recollection of the timetable of events and disavowed his testimony that reduction to practice of the Cole invention occurred before RCA's proposal to FAA. *RCA Corp.*, 701 F.Supp. at 465, 8 USPQ2d at 1313. The district court found incredible Clark's changed testimony, which was "in stark contrast" to his earlier version of events. *Id.*

In the *HLA* litigation, while it was known that RCA submitted a bid to the FAA, apparently the exact date of the bid could not be ascertained with certainty. In particular, the RCA proposal document was not produced in that litigation and the possible on-sale bar was not apparent. While DGC asserts fraud in the nondisclosure, it suffices to say here only that, in this case, RCA did produce the actual document, which disclosed that the exact date of RCA's offer had been early enough to trigger the on-sale bar if it covered the Cole invention. The court found that it was *only after* production of this document that Clark's testimony regarding the date of reduction to practice of the Cole invention emerged as a potential liability, and that that possibility led to a "stunning about face" in Clark's testimony. *RCA Corp.*, 701 F.Supp. at 466, 8 USPQ2d at 1313. The district court's assessment of which version of Clark's testimony to accept was well within its discretion, and its finding that the Cole invention had been reduced to practice before the FAA bid is well supported by Clark's original testimony and documents of record.

### Requirements of the On–Sale Bar

As explained in *UMC Electronics Co. v. United States*, 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), determination that a patent is invalid by reason of being on-sale within the meaning of section 102(b) "does not lend itself to formulation into a set of precise requirements." However, to make a *prima facie* case, "the challenger has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. *Cf. D.L. Auld [v. Chroma Graphics Corp.]*, 714 F.2d [1144] at 1150, 219 USPQ [13] at 17 (102(b) only)." *Id.*

In this case, the district court found that the previously-mentioned proposal which RCA made to the FAA, was a definite offer to sell for commercial gain; that the offer was made more than one year before the application for the Cole patent; and that the Cole invention was offered therein. These findings led the district court to conclude that the Cole invention was on-sale within the meaning of section 102(b). RCA attacks the district court's conclusion on factual and legal grounds.

### RCA's Offer to FAA

In August 1962, the FAA sent a Request for Proposal (RFP) and an Engineering Requirement (ER) for character generation equipment to ten companies. Contractors were to respond providing "all necessary qualified personnel, facilities, materials, equipment and services and ... design, develop, fabricate, test and furnish an alphanumeric and symbol generation equipment for use with rectilinear raster scan type of radar brights displays." On October 8, 1962, RCA submitted its proposal for "Character & Symbol Generation Equipment." The display system proposed, which was called the "RTGV" system,[6] was designed primarily by RCA engineer Walter Helbig of RCA's Data Systems Division in Van Nuys, California.

As an initial matter, we address RCA's challenge to the district court's finding that RCA's proposal to FAA offered the Cole invention. RCA argues that the proposal

---

**6.** The district court opinion referred to the proposed system as the "RTGV" system (an acronym for real time generation of video). For consistency, we will continue to use that desig-nation, however, it bears mentioning that the claimed Cole system is also one that functions in "real time."

was for the different, more complex RTGV system, which literally is correct. However, for reasons given below, that fact does not preclude a finding that the Cole invention was being impermissibly commercialized by the offer of the more complex system.

The district court correctly found that "[t]hroughout *HLA,* RCA maintained that the RTGV system was evidence of feasibility and reduction to practice of Cole." *RCA Corp.,* 701 F.Supp. at 467, 8 USPQ2d at 1314. One example cited by the court related to Helbig's discussion of a block diagram figure of the RTGV video bit generator. Helbig explained that the block " 'shows basically the system that was covered in the invention disclosure for Cole–Corson–Stocker [Cole patent], plus the additional components that we had to add to make up for the random positioning of the characters and for the color in the display.' " *Id.* Helbig's testimony that the device to be developed was the Cole invention "with additional components" was never disavowed. As further support the district court noted that in the *HLA* litigation, Helbig testified that RCA intended, if awarded a purchase contract to supply the RTGV systems, to use the Cole invention in the equipment supplied to FAA. *Id.* at 467, 8 USPQ2d at 1314. The above testimonial evidence could well be sufficient in itself to establish that the Cole invention was being offered to the FAA.

RCA discounts the above testimonial evidence and argues that DGC had to show that the Cole patent claims "read on" the RTGV system. We understand this position to be that the bid documents themselves must disclose the invention with respect to all claim elements. This is clearly not legally correct. For example, merely offering to sell a product by way of an advertisement or invoice may be evidence

of a definite offer for sale or a sale of a claimed invention even though *no* details are disclosed. That the offered product is in fact the claimed invention may be established by any relevant evidence, such as memoranda, drawings, correspondence, and testimony of witnesses. Here, there is testimonial evidence that the offeror intended to offer the invention. In addition, the bid documents themselves contain a technical description which is sufficient to identify the Cole invention, albeit not set forth in the language of the claims *in haec verba.*[7] We see no basis for overturning the district court's conclusion that the bid offered the Cole invention.

Alternatively, RCA insists that the entirety of the subject matter in the proposal must be found in the Cole claims. For example, RCA urges that DGC failed to prove that the RTGV system embodies the claimed Cole invention because claims 2 and 3 (per RCA) require an entirely digital system and the RTGV system was not entirely digital, having some analog components. The court noted that, in more than one place in its proposal, RCA described the RTGV alphanumeric and symbol generator and specifically stated that " 'it can be seen from the functional description of the RTGV equipment ... that this equipment is almost entirely digital in nature.' " *RCA Corp.,* 701 F.Supp. at 467, 8 USPQ2d at 1314. RCA argues that the court, in relying on that statement, ignored the presence of analog delay lines. The court did not ignore the presence of analog components. Indeed, it acknowledged that there are "[e]xceptions to this digital nature [that] are entirely in the [not claimed] video amplifiers required as output from the video dot generator matrix." *Id.* The court quite correctly placed no legal significance on the analog circuitry because no analog

---

7. In particular this description reads:
The digital generation of a set of raster signals representing each character is obtained by storing in a core matrix the representation of each character to be presented as an arrangement of dots. Specification of a particular character or symbol to be written serves as the address to select that particular matrix out of the sum of all matrices which might be scanned in synchronism with the TV raster. The desired position of the symbol, in terms of coordinates referenced to the display face, specifies the time when its matrix is to be scanned. This is obtained by keeping track of the X and Y position of the beam in accordance with the raster. By recirculating on a frame basis that material which is to be presented, the function of flicker-free storage is obtained.

circuitry is claimed. The fact that the RTGV system may feature additional analog circuitry does not negate the determination that the claimed invention was offered.

In sum, we conclude that the district court's finding that RCA's bid proposal offered the Cole invention is amply supported by the evidence.

### Experimental Use

RCA asserts that the bid cannot create an on-sale bar because the proposal was for research and development of the complex RTGV system and was, therefore, an experimental use. If we accept the proposition that the RTGV system was still in the experimental stage and, thus, was not on-sale within the meaning of section 102(b), it does not follow that that experimental use "defense" can also be used to rebut the *prima facie* case that the Cole invention was on-sale. The question here is not whether the RTGV system was on-sale, but whether the Cole invention was. At this point the district court's holding that the Cole invention had been reduced to practice takes on a dual significance.

As held in *UMC*, 816 F.2d at 656, 2 USPQ2d at 1471, an invention cannot be offered for sale within the meaning of section 102(b) if the offerer has only a mere concept of the invention. As also indicated in *UMC*, while an invention need not be reduced to practice to be on sale, such proof may "lighten the burden of the party asserting the bar." *Id.* Under our precedent, actual reduction to practice of the subject invention means, *inter alia*, that an actual embodiment which included *all elements* of the claim had been built. *UMC*, 816 F.2d at 652, 2 USPQ2d at 1468; *see also Correge v. Murphy*, 705 F.2d 1326, 1329, 217 USPQ 753, 755 (Fed.Cir.1983). Thus, the holding that the Cole invention had been reduced to practice before the FAA offer precludes any argument that the subject matter of the sale could not possibly be the invention as claimed because it was in only a preliminary stage of development. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 837–38, 221 USPQ 561, 566–67

(Fed.Cir.1984). Also, under our precedent, experimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice. *Id.; see also Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1580–81, 222 USPQ 833, 838 (Fed.Cir.1984); *Gould, Inc. v. United States*, 579 F.2d 571, 572, 583, 217 Ct.Cl. 167, 169, 190, 198 USPQ 156, 157–58, 167 (1978); *Ushakoff v. United States*, 327 F.2d 669, 672, 164 Ct.Cl. 455, 460, 140 USPQ 341, 343 (1964).

Thus, having been reduced to practice, a sale or offer to sell the Cole invention is no longer justifiable as experimental use.

RCA, nevertheless, argues that an invention which has been reduced to practice cannot be placed on sale in the context of a contract to develop a specifically different product which is in the experimental stage. Reduced to simplest terms, RCA's position is that an offer to sell A, a device reduced to practice, in combination with B, the combination not having been reduced to practice, must be deemed an experimental use of A. We think not.

The question of whether a sale or offer can partially be a bar and partially be excused as experimental use is not entirely novel. *See In re Brigance*, 792 F.2d 1103, 1109, 229 USPQ 988, 991–92 (Fed.Cir.1986) ("This court and its predecessors have stated that the experimental use exception does not apply to experiments performed with respect to nonclaimed features of an invention."); *Western Marine Elecs., Inc. v. Furuno Elec. Co.*, 764 F.2d 840, 847, 226 USPQ 334, 339 (Fed.Cir.1985) ("The trial court properly recognized that testing or experimentation performed with respect to non-claimed features of the device does not show that the *invention* was the subject of experimentation."); *In re Theis*, 610 F.2d 786, 793, 204 USPQ 188, 193–94 (CCPA 1979) ("It is settled law that the experimental sale exception does not apply to experiments performed with respect to non-claimed features of an invention.")

RCA's broad brush approach that the experimental use justification must be applied to the subject matter of the offer as a

whole could easily lead to circumvention of the purposes of the on-sale bar. *See General Elec. Co. v. United States,* 654 F.2d 55, 61–64, 228 Ct.Cl. 192, 201–07, 211 USPQ 867, 873–75 (Ct.Cl.1981). One policy underlying the bar is to obtain widespread disclosure of new inventions to the public via patents as soon as possible; another is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17–year period. *Id.* Both are violated under RCA's theory and we reject it. As we have stated a number of times, the policies or purposes underlying the on-sale bar, in effect, define it. *J.A. LaPorte, Inc. v. Norfolk Dredging Co.,* 787 F.2d 1577, 1582, 229 USPQ 435, 438 (Fed.Cir.), *cert. denied,* 479 U.S. 884, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

 RCA presents a variation of the purported experimental use justification with its argument that because the offer was for experimental development of the RTGV system, there was no "definite offer." We also reject this theory. RCA is correct that, where there is no sale, a definite offer to sell is an essential requirement of the on-sale bar, *UMC,* 816 F.2d at 656, 2 USPQ2d at 1472; however RCA misinterprets that requirement. The requirement of a *definite* offer excludes merely indefinite or nebulous discussion about a possible sale. While this requirement may be met by a patentee's commercial activity which does not rise to the level of a formal "offer" under contract law principles, (*see,* *e.g.,* analysis of pre-bid activities related to a government contract in *General Elec. Co. v. United States,* 206 USPQ 260, 276–77 (Ct.Cl.Tr.Div.1979)), a definite offer in the contract sense clearly meets this requirement. *See, e.g., Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463–64, 7 USPQ2d 1325, 1327–28 (Fed.Cir.1988). An offer to conduct experimental work may be as firm and definite, in the contract sense, as an offer to sell a product. However,

such an offer may not constitute a bar because of policy considerations which allow an inventor to engage in experimentation to develop his invention. *Western Marine Elecs., Inc.,* 764 F.2d at 845, 226 USPQ at 337. *See also Great N. Corp. v. Davis Core & Pad Co., Inc.,* 782 F.2d 159, 164–65, 228 USPQ 356, 358 (Fed.Cir.1986). On the other hand, a definite offer is not made *indefinite* because it concerns experimental work.

In this case, the district court made the correct analysis of the "definite offer" issue. As the court noted, RCA's bid was embodied in a lengthy written proposal providing background information, a detailed delivery schedule, a rate of completion of the proposed work and a separate section on financial data and costs. In its brief on appeal, RCA acknowledges that FAA could have "accepted" RCA's proposal which is the characteristic of a definite formal offer. That FAA did not accept is immaterial. *A.B. Chance Co. v. RTE Corp.,* 854 F.2d 1307, 1311, 7 USPQ2d 1881, 1884 (Fed.Cir. 1988); *UMC,* 816 F.2d at 653, 2 USPQ2d at 1469.

Thus, there was a definite offer by RCA to sell which was proved to cover the subject invention, after that invention had been reduced to practice. That offer was made in this country more than one year prior to filing the application which matured into the Cole patent. Under these circumstances the claims are invalid under section 102(b). An "offer to sell a completed invention is sufficient to support a rejection under section 102(b)." *In re Brigance,* 792 F.2d at 1107, 229 USPQ at 990.

 One final matter involves RCA's argument that because the contract was for "services" to design and develop a prototype, no "thing" was offered for sale.[8] At the same time RCA urges that the court not use labels, but that it consider the totality of the circumstances.

We agree with RCA that an on-sale bar cannot be determined by ascribing a label

---

8. RCA points out that the contract was to be on a cost plus fixed fee basis and that the "competitive procurement" contract for production quantities of the system that would be ultimately designed, developed, and satisfactorily tested was not a part of the development contract involved here.

to certain activity so as to make it appear to be commercial, in lieu of considering whether the activity runs counter to the policies of the on-sale bar that are to be effectuated. Inconsistently RCA argues that, because the FAA's RFP and ER pertain to "developmental services," *ipso facto*, a responsive proposal does not implicate the on-sale bar. If that were the case, we would be doing what RCA has asked the court not to do: allow labels to determine the result. The purpose of the on-sale bar is to disallow protection for an invention which was being commercialized more than one year prior to the filing of a patent application for that invention. Where such commercialization is proved, the activity is not negated simply by labelling a contract in which the invention is offered as one for "services."

For the above reasons, RCA has failed to establish either factual or legal error in the district court's conclusion that the Cole invention had been placed on sale within the meaning of section 102(b).

## II.

### RCA'S CONTRACT COUNTS

■ The district court denied RCA relief on its contract claims for rescission of the contract or, alternatively, for breach of contract damages. These claims of RCA are based on an agreement granting DGC a royalty bearing license under the Cole patent effective September 30, 1981. RCA gave DGC a notice of termination of the license on July 9, 1984, a few months after this suit was filed, by reason of DGC's purported failure to make reports and pay royalties.

RCA first contacted DGC in 1973, and repeatedly thereafter, offering a license under the Cole patent. Negotiations spanned the period 1978–1981. Upon entering the license, DGC paid no royalties for alleged past infringement and, in each of its quarterly reports to the licensor, it stated that no royalties were due because it made no

use of the Cole invention. DGC asserts that it also made RCA aware that it was challenging the patent's validity as well, prior to and upon entering the license agreement, and, therefore, it had no liability for any royalties once the patent was held invalid.

RCA maintains that DGC entered the agreement with a secret intent never to pay royalties and that RCA would never have entered the agreement but for DGC's deception. On appeal, RCA requests a remand of the issue of rescission of the agreement, but only *if we reverse the invalidity holding.*[9]

On first impression this fact situation appears to present a prime vehicle for extended discussion of a licensor's right to royalties under a licensing contract, prior to its termination, in light of the Supreme Court's decision in *Lear Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). Upon closer scrutiny, it does not.

In marked contrast to the court's exhaustive analysis of all other issues, the contract issues were treated summarily in the district court's opinion. Similarly, the parties' treatment of the complex matters here is superficial and confusing, if not misleading. RCA asserts that the district court misinterpreted *Lear* in holding that RCA was not entitled to "royalties" up to the date of termination of the license contract. One difficulty with RCA's argument is that the district court did not so hold. The court actually ruled that RCA was not entitled to *rescission* of the license agreement or to *breach of contract damages.*

Despite a search through a twelve-volume appendix, we can find no indication that RCA ever sought an award of royalties under the contract. The only document noted relating to damages shows a calculation of infringement damages on the basis of DGC's gross sales. That calculation bears no relationship to the amount of royalties specified in the contract. In view

---

**9.** We must comment at this point that if the agreement is subject to rescission, rescission would be in order regardless of whether we held the patent valid or invalid. Also if we simply accepted RCA's position that the alleged contract represented "no meeting of the minds," the matter of damages for *breach* of contract would be mooted.

of the court's summary dismissal, and RCA's arguments of DGC's misconduct, we are led to surmise that both the rescission and breach arguments RCA made may have been tied to DGC's misconduct at *inception* so that under either theory it would receive infringement damages if the patent were valid and infringed. Upon the district court's holding the patent invalid, we again surmise that RCA's contract claims fell as well, and the district court did not need to make a detailed analysis. We do not, however, rest our decision to affirm on mere speculation.

On appeal, RCA carries the burden of persuading this court not only that the district court misunderstood the law, if it did, but that the court's misunderstanding manifestly affected the substantial rights of a party. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 892, 8 USPQ2d 1468, 1480 (Fed.Cir. 1988); *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1021, 226 USPQ 881, 884 (Fed.Cir.1985); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580, 219 USPQ 8, 12 (Fed.Cir.1983). Claims for rescission, for breach of contract, and for enforcement of a contract to collect royalties are basically claims under state law. Despite the voluminous appendix, RCA has provided us with no copy of the pleadings so that we might confirm the exact nature of its state law contract claims; in its brief, it makes no reference to the contract provisions; it provides no citation whatsoever of state statutes or case law which supports its alleged rights, whatever they may be; and indeed, it does not even tell us which state law might apply.

RCA appears to rely on *Lear* as *mandating* breach of *contract damages* where a licensee does not pay royalties. *Lear* simply does not address that issue. *Lear* abrogated the doctrine of "licensee estoppel" principles developed under state law, and also precluded the award of royalties to the licensor under the facts of *that case* from the date the patent issued if the patent were later held invalid. *Lear* does not in fact discuss a licensor's right to royalties where a license agreement was entered *after* a patent issued, as here. Nor does it

deal with a licensor's right to terminate or rescind a license agreement, or dictate what *must* be held a breach of contract, or what damages *must* be awarded for a breach, or under what circumstances, if any, a licensee can recover royalties paid. Those questions continue to be matters dependent on particular fact situations, contract provisions and state contract law, albeit they must be resolved in harmony with general principles discernible from *Lear*. *See, e.g., Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 228 USPQ 189 (Fed.Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986); *Rite–Nail Pkg. Corp. v. Berryfast, Inc.*, 706 F.2d 933, 219 USPQ 104 (9th Cir.1983); *Bristol Locknut Co. v. SPS Technologies, Inc.*, 677 F.2d 1277, 216 USPQ 867 (9th Cir.1982); *PPG Indus., Inc. v. Westwood Chem., Inc.*, 530 F.2d 700, 189 USPQ 399 (6th Cir.), *cert. denied*, 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976).

Our objective here, however, is not to expound on *Lear*, or even to try to uphold the district court's cryptic statements. The contract issues simply were not developed or presented in this appeal in a way which permits any meaningful review. The only point that seems reasonably clear is that RCA did not sue for *enforcement* of the contract to collect *royalties* accrued between its effective date and the date of its purported termination. Yet its entitlement to such royalties is the only issue it argues on appeal.

In sum, RCA has failed to carry its burden on appeal to persuade this court that the adverse *judgment* of the district court on the contract count (or counts) is in error. Accordingly, we affirm that part of the judgment.

## III.

## ATTORNEY FEES

DGC seeks attorney fees under 35 U.S.C. § 285 (1982), which authorizes a district court, in its discretion, to award fees to a prevailing party upon finding that the case

is "exceptional."[10] DGC urges two grounds for finding this case to be exceptional:

(1) RCA committed fraud on the *HLA* court in suppressing evidence, particularly the FAA proposal; and

(2) RCA was guilty of inequitable conduct in prosecuting the Cole patent by failing to bring certain references and the FAA proposal to the attention of the PTO.

The district court twice considered the issue of RCA's alleged fraud on the *HLA* court, wrote two opinions carefully weighing the evidence of that alleged misconduct, concluding each time that DGC failed to prove its allegations. The district court refused to infer a "fraudulent scheme" from RCA's conduct. *RCA Corp.*, 701 F.Supp. at 472, 8 USPQ2d at 1318.

Similarly, the district court held that DGC failed "to establish a threshold showing of RCA's intent to mislead the PTO." *Id.* at 474, 8 USPQ2d at 1320. The district court's ruling appears to have anticipated our holding in *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 9 USPQ2d 1384 (Fed.Cir.1988) (*in banc*), *cert. denied*, — U.S. —, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989), that a *finding* of intent to deceive the PTO is necessary to sustain a charge of inequitable conduct. Contrary to DGC's argument, we are not led to conclude from the district court opinion that the district court believed it could find inequitable conduct only where there is *direct* proof of subjective wrongful intent on the part of persons acting for RCA. Rather the court looked at all of the circumstances, including what RCA did disclose, and concluded that RCA's course of conduct did not show attempted concealment of prior art. Such an analysis is in accord with *Kingsdown*, 863 F.2d at 876, 9 USPQ2d at 1392.

Simply because we might have reached a different result or might have affirmed had

the district court gone the other way are insufficient bases for reversal under the abuse of discretion standard which applies to our review of this part of the court's judgment. Under that standard, DGC must persuade us that the district court's denial of DGC's attorney fees rested on clearly erroneous findings or a misunderstanding of the law or that the district court's decision was in some way arbitrary or irrational. *Id.* DGC has failed to carry that heavy burden.

### IV.

#### *Conclusion*

The judgment of the district court for the defendant DGC in these proceedings but denying DGC an award of attorney fees is affirmed.

#### *Costs*

Each party shall bear their own costs. AFFIRMED.

---

**10.** 35 U.S.C. § 285 reads: The court in exceptional cases may award reasonable attorney fees

to the prevailing party.